# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

RHODE-NYC, LLC

                    Plaintiff,
        v.

RHODEDEODATO CORP., HRBEAUTY,
LLC d/b/a RHODE, and HAILEY BIEBER,

                    Defendants.

Civil Action No. 22-cv-5185

## RHODE-NYC, LLC'S MEMORANDUM OF LAW IN SUPPORT OF ITS
## <u>ORDER TO SHOW CAUSE FOR A PRELIMINARY INJUNCTION</u>

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

FACTUAL BACKGROUND ............................................................................. 3

    *Khatau and Vickers build the RHODE brand from scratch.* ................................ 3

    *Defendants adopt the RHODE Marks despite Rhode's efforts at resolution.* ......... 5

    *Defendants launch their brand under the RHODE Marks.* ................................. 7

    *Consumer confusion has been immediate and widespread.* ............................... 10

    *Rhode is suffering ongoing harm from Defendants' use of its mark.* .................. 13

ARGUMENT .................................................................................................... 16

  I.    RHODE IS LIKELY TO SUCCEED ON THE MERITS. ................................. 16

      A.    Rhode Owns Protectable Marks ........................................................ 17

      B.    Defendants' Use Of The Mark Is Highly Likely To Cause Confusion. ............................................................................ 18

  II.   RHODE IS FACING DEEPENING AND IRREPARABLE HARM. ................ 30

  III.  THE BALANCE OF EQUITIES TIPS DECIDEDLY IN RHODE'S FAVOR. ............................................................................................. 32

  IV.  RHODE'S REQUESTED RELIEF IS IN THE PUBLIC INTEREST ............... 34

CONCLUSION ................................................................................................. 35

i

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
  237 F.3d 198 (3d Cir. 2000)....................................................................................18, 19, 20

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
  537 F.2d 4 (2d Cir. 1976)......................................................................................................19

*Akiro LLC v. House of Cheatham, Inc.*,
  946 F. Supp. 2d 324 (S.D.N.Y. 2013)..................................................................................21

*Ameritech, Inc. v. Am. Info. Techs. Corp.*,
  811 F.2d 960 (6th Cir. 1987) ...............................................................................................17

*Arrow Fastener Co. v. Stanley Works*,
  59 F.3d 384 (2d Cir. 1995)....................................................................................................28

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
  841 F.2d 486 (2d Cir. 1988)......................................................................................17, 18, 21

*BigStar Ent., Inc. v. Next Big Star, Inc.*,
  105 F. Supp. 2d 185 (S.D.N.Y. 2000)..................................................................................18

*Brennan's, Inc. v. Brennan's Rest., L.L.C.*,
  360 F.3d 125 (2d Cir. 2004)..................................................................................................18

*Cadbury Beverages, Inc. v. Cott Corp.*,
  73 F.3d 474 (2d Cir. 1996)....................................................................................................22

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*,
  794 F.2d 38 (2d Cir. 1986)....................................................................................................32

*City of New York v. Lopez*,
  No. 21 CV 7862, 2021 WL 6063839 (S.D.N.Y. Dec. 21, 2021).......................................31, 35

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
  604 F.2d 200 (2d Cir. 1979)..................................................................................................29

*Diesel Props S.R.L. v. Greystone Business Credit II LLC*,
  No. 07-CV-9580, 2008 WL 594773 (S.D.N.Y. Mar. 5, 2008)..............................................33

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*,
  30 F.3d 466 (3d Cir. 1994)....................................................................................................22

*Girl Scouts v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
   808 F. Supp. 1112 (S.D.N.Y.1992)............................................................30

*GoTo.com, Inc. v. Walt Disney Co.*,
   202 F.3d 1199 (9th Cir. 2000) ...............................................................30

*H. Lubovsky, Inc. v. Espirit de Corp.*,
   627 F. Supp. 483 (S.D.N.Y. 1986) .........................................................19

*Hope Organics LLC v. Preggo Leggings LLC*,
   No. 21-CV-2416, 2021 WL 5919367 (S.D.N.Y. Dec. 15, 2021) ...........19, 31, 33, 34

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
   2 F.4th 1150 (9th Cir. 2021) ..............................................................17, 25

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
   930 F. Supp. 2d 489 (S.D.N.Y. 2013)....................................................35

*Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*,
   945 F. Supp. 563 (S.D.N.Y. 1996) .......................................................34

*Malletier v. Dooney & Bourke, Inc.*,
   561 F. Supp. 2d 368 (S.D.N.Y. 2008).....................................................21

*Marketquest Grp., Inc. v. BIC Corp.*,
   862 F.3d 927 (9th Cir. 2017) ...........................................................27, 28

*Morningside Grp. Ltd. v. Morningside Cap. Grp.*,
   182 F.3d 133 (2d Cir. 1999)...........................................................21, 27, 30

*Museum of Mod. Art v. MOMACHA IP LLC*,
   339 F. Supp. 3d 361 (S.D.N.Y. 2018).................................................31, 33

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
   704 F. Supp. 2d 305 (S.D.N.Y. 2010)...............................................22, 31, 35

*Nabisco, Inc. v. Warner-Lambert Co.*,
   220 F.3d 43 (2d Cir. 2000)...................................................................18

*Off-White, LLC v. Alins*,
   No. 19 Civ. 9593, 2021 WL 4710785 (S.D.N.Y. Oct. 8, 2021) .................34

*On-Line Careline, Inc. v. Am. Online, Inc.*,
   229 F. 3d 1080 (Fed. Cir. 2000)............................................................30

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
   469 U.S. 189 (1985)............................................................................35

*Pfizer Inc. v. Sachs*,
    652 F. Supp. 2d 512 (S.D.N.Y. 2009)..........................................................................29, 30

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961)..................................................................................................18

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*,
    754 F.2d 91 (2d Cir. 1985)...................................................................................................31

*Savin Corp. v. Savin Grp.*,
    391 F.3d 439 (2d Cir. 2004)...........................................................................................18, 29

*Scarves by Vera, Inc. v. Todo Imports Ltd.*,
    544 F.2d 1167 (2d Cir. 1976)...................................................................................22, 23, 28

*Strange Music, Inc. v. Strange Music, Inc.*,
    326 F. Supp. 2d 481 (S.D.N.Y. 2004)..................................................................................23

*Sunenblick v. Harrell*,
    895 F. Supp. 616 (S.D.N.Y. 1995) ................................................................................25, 27

*Thoip v. Walt Disney Co.*,
    736 F. Supp. 2d 689 (S.D.N.Y. 2010)......................................................................17, 20, 21

*Tri–Star Pictures, Inc. v. Unger*,
    14 F. Supp. 2d 339 (S.D.N.Y. 1998).............................................................................23, 30

*Two Hands IP LLC v. Two Hands Am., Inc.*,
    563 F. Supp. 3d 290 (S.D.N.Y. 2021)..................................................................................21

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011)......................................................................32, 34, 35

*Van Praagh v. Gratton*,
    993 F. Supp. 2d 293 (E.D.N.Y. 2014) ..................................................................................16

*Virgin Enters. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003)...................................................................................16, 22, 29

*Wal-Mart Stores, Inc. v. Samara Bros.*,
    529 U.S. 205 (2000)............................................................................................................17

*Warner-Lambert Co. v. Northside Dev. Corp.*,
    86 F.3d 3 (2d Cir. 1996).......................................................................................................33

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275, (2d Cir. 2012)...............................................................................................34

*Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*,
  835 F.2d 990 (2d Cir. 1987)...................................................................19

*Zino Davidoff SA v. CVS Corp.*,
  571 F.3d 238 (2d Cir. 2009)...................................................................16

**Statutes**

15 U.S.C. § 1114.......................................................................................16

15 U.S.C. § 1116(a)..............................................................................16, 31

15 U.S.C. § 1125(a)...................................................................................16

**Rules**

Fed. R. Civ. P. 65......................................................................................36

Fed. R. Civ. P. 65(a)(2)...............................................................................1

**Other Authorities**

*Abby Dupes & Leah Campano*, *Everything We Know About Hailey Bieber's
  Skincare Brand, Rhode*, Seventeen (June 15, 2022),
  https://tinyurl.com/mr2s8sf9....................................................................20

Darian Symoné Harvin & Zoey Grossman, *Hailey Bieber Knows You're Sick of
  Celebrity Beauty Brands*, Allure (May 2022), https://tinyurl.com/2kweecmp........................20

George Driver, *Everything You Need To Know About Hailey Bieber's Skincare
  Line Rhode*, Elle (June 9, 2022), https://tinyurl.com/murwzcjn.............................................20

Hailey Bieber (@haileybieber0), Instagram,
  https://www.instagram.com/p/CejOBjAFF1D/ (last visited June 14, 2022)..........................20

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1
  (5th ed. 2022)............................................................................................17, 20

Lauren Rearick, *Hailey Bieber's Rhode Brand: Everything We Know So Far*,
  Teen Vogue (Apr. 8, 2022), https://tinyurl.com/2p92b6j9....................................................20

Plaintiff Rhode-NYC, LLC ("Rhode") respectfully submits this memorandum of law in support of its Order to Show Cause for a Preliminary Injunction pursuant to Fed. R. Civ. P. 65(a)(2), to enjoin Defendants Rhodedeodato Corp., HRBeauty, LLC d/b/a Rhode, and Hailey Bieber ("Defendants") from using "rhode" as a name, trade name, or trademark, as a domain name, on social media accounts, or in any other way that it is likely to cause confusion with Rhode and its own brand RHODE.

## INTRODUCTION

It's hard to build a brand from scratch, especially in the fashion industry.  It was for Plaintiffs and co-founders Purna Khatau and Phoebe Vickers.  When they conceived of Rhode in 2013, they had no name recognition, no connections, and no following.  But the former college roommates did share a passion for travel and a nagging awareness of a gap in their wardrobes—and maybe a gap in the marketplace, too.  So, they started a women's clothing company, launching a line of easy-but-sophisticated travel wear.  They devoted themselves to building and promoting the RHODE brand, honing their aesthetic, expanding their product lines, and doggedly working to get the brand featured on fashion blogs and offered in stores.  Eight years later, their RHODE-branded products have been featured in magazines like *Vogue*, carried in stores like Saks Fifth Avenue, and worn by celebrities and fashion influencers.  Rhode is a quintessential modern success story—two women entrepreneurs, uniting diverse cultural backgrounds and shared taste to make products people love.

But now another quintessential modern story threatens Rhode's very existence. Defendant Hailey Bieber is mega-famous—like, 45-million-Instagram-followers famous.  Now a wildly successful model and media personality, Bieber was getting started on the runway when Khatau and Vickers started shipping dresses from their apartments.  And while Khatau and

Vickers spent nine years hustling to get their brand online and on shelves, Bieber's stardom grew, with ever more magazine covers, runway gigs, and photo sessions.  She is now among the most recognizable young celebrities on the planet.  She has decided to leverage that fame to market a line of beauty products, which she launched on June 15.  And she insists on giving that brand her own middle name, which unfortunately happens to be Rhode.

Without the law's intervention, there is no suspense in how these colliding stories end: The RHODE brand Khatau and Vickers built gets swamped, washed under by a famous superstar who does not much care that the name she prefers for her beauty products is already being used by two other women entrepreneurs.  Bieber's "rhode"-branded products will first saturate the beauty market that overlaps with the women's clothing and lifestyle market in which Rhode operates.  Bieber has indicated that "rhode"-branded clothing is next, and her fans are already talking about it on social media.  Bieber's immense name recognition, media presence, and following will overwhelm the goodwill and reputation Rhode's founders worked so hard to generate.  And indeed, actual confusion is already rampant, as consumers encounter dueling Instagram handles and websites with "Rhode" in the name and wonder if Rhode's products are in fact Bieber's, or Rhode has itself launched a skincare line with an influencer.  Far from dispelling confusion, Bieber appears intent on exacerbating it, adopting taglines like "shop rhode" and "on the rhode" that Rhode itself has been using for years.

Having tried and failed to appeal to Bieber and her various corporations to avoid this result, Rhode has no choice but to seek relief under the Lanham Act and New York common law to protect its federally-registered RHODE Marks and to request that the Court immediately enjoin Defendants' use of their confusingly similar "rhode" mark.  Such relief is eminently justified.  This is a textbook case of reverse confusion, in which a massive junior trademark user

threatens to trample a smaller senior user's mark.  The magnitude of Bieber's following and the virality of her marketing will cause immediate, ongoing, and irreparable harm to Rhode's brand. And the hardships and public interest weigh overwhelmingly in favor of protecting the nine-year investment of two upstart entrepreneurs over the latest mega-venture by a mega-star.

Bieber has every right to leverage her own hard-earned fame to launch a beauty brand. Rhode does not begrudge Bieber her success.  On the contrary, it celebrates the success of all woman entrepreneurs.  But while Bieber clearly places enormous value on use of "rhode," she could have picked another mark and built *that* brand without destroying someone else's hard work.  Khatau and Vickers, on the other hand, started from scratch and did it the hard way.  The RHODE Marks and the goodwill associated with them are the most important asset they have. Trademark law exists to protect that interest.  The Court should grant the preliminary injunction.

## FACTUAL BACKGROUND

The facts relevant to this motion are fully set forth in the Verified Complaint, filed on June 21, 2022, and the Declarations of Purna Khatau and Phoebe Vickers, dated June 20, 2022, and are summarized herein.

### *Khatau and Vickers build the RHODE brand from scratch.*

In 2014, Khatau and Vickers launched Rhode to pursue their vision of forming a clothing and lifestyle brand inspired by global culture, adventure, and carefree confidence.  Compl. ¶¶ 1, 26.  Khatau and Vickers had the idea for the company the previous year and built it from the ground up.  Compl. ¶ 8; Khatau Decl. ¶¶ 4-8; Vickers Decl. ¶¶ 3, 11.  They scoured fabric markets to find the perfect material for their clothes, working with a local tailor to bring their designs to life.  Vickers Decl. ¶ 4.  To make shipments, Vickers would walk from her apartment to the local FedEx several times a day.  Vickers Decl. ¶ 10.  And the label they chose, "Rhode,"

was a reflection of the company's DNA:  Inspired by the Greek mythological sea nymph who presided over the island Rhodes, the name captured the worldly and exuberant spirit Khatau and Vickers imbued in their products.  Compl. ¶ 27; *see* Vickers Decl. ¶ 3.

Product line by product line, store by store, blog by blog, Khatau and Vickers made their vision real.  Today, Rhode is known for its high-quality clothing, designed on timeless silhouettes in vivid colors and globally inspired prints.  Khatau Decl. ¶ 7; *see* Compl. ¶¶ 2, 26, 27.  Celebrities including Beyoncé, Rihanna, Mindy Kaling, Tracee Ellis Ross, and Lupita Nyong'o have worn and been photographed in Rhode clothing.

  

MINDY KALING          TRACEE ELLIS-ROSS          LUPITA NYONG'O

Compl. ¶ 30; Khatau Decl. ¶ 10.  Rhode's fashion and home products are sold at Bergdorf Goodman, Neiman Marcus, Saks Fifth Avenue, Bloomingdales, and other high-end stores are also featured on online luxury retailers.  Compl. ¶ 28; Khatau Decl. ¶ 8.  And the brand has enjoyed wide acclaim from the fashion industry, including recognition in Vogue, Harper's Bazaar, and dozens of similar publications worldwide.  Compl. ¶ 29; Khatau Decl. ¶ 11.

Rhode's financial growth is equally staggering.  Having sacrificed steady jobs to bet on themselves, Khatau and Vickers' first-year sales were less than $100,000.  Compl. ¶ 106; Khatau Decl. 15.  Rhode's projected sales for 2022 are $14.5 million—growth of over 14,500%, in an

4

intensely competitive industry and an economy that weathered the COVID pandemic.  Compl. ¶¶ 31, 106; Khatau Decl. ¶ 15.  Rhode's success has allowed it to expand into new product lines, too, with even more expansion in the works.  As part of its initial vision to evolve into a lifestyle brand, Rhode also has home goods under its RHODE Marks.  Rhode also has plans to expand into footwear, accessories, men's clothing, jewelry, swimwear, and more.  Compl. ¶¶ 35-36; Khatau Decl. ¶¶ 12, 20; Vickers Decl. ¶ 23.  And Rhode has also "considered expanding into cosmetics and skincare," viewing it as a "natural and expected extension and a step we hoped to take in the future."  Khatau Decl. ¶ 21.

To protect its investment and goodwill, Rhode has established and registered its trademarks.  The "RHODE Marks" include three U.S. trademark registrations for RHODE—for clothing (Reg. No. 5286239), handbags (Reg. No. 6267443), and textiles, children's and women's clothing, hair accessories, dolls, puzzles, and holiday ornaments (Reg. No. 6539188).  In addition to these trademark rights, Rhode has established common law rights to the mark RHODE and to its tagline, "on the rhode," in use since 2014.  All of the products underlying Rhode's millions of dollars in sales bear its distinctive RHODE Marks, which have been in continuous, uninterrupted use since the company's founding in 2013.  Compl. ¶¶ 33-41; Khatau Decl. ¶ 19.

### *Defendants adopt the RHODE Marks despite Rhode's efforts at resolution.*

The internationally famous Bieber and her companies have apparently been considering the launch of a product line for years.  And for several years, they have been fully aware of Rhode's brand and the RHODE Marks.  In late 2018, they sought to purchase the RHODE trademark for clothing for their own use.  Their counsel advised Rhode that he had just filed a trademark application to register the mark "rhode" for class 25 goods, including clothing.

Compl. ¶¶ 46-48.  Recognizing that the application would not succeed given Rhode's registration, he asked if Ms. Bieber could purchase the mark.[1]  Compl. ¶ 48.  Khatau and Vickers refused.  They had built their growing brand out of their apartments, and the RHODE Marks were their most significant asset.  Compl. ¶ 49.  When Rhode refused to sell and its trademark registration was cited against Defendants, Defendants abandoned their application.  Compl. ¶ 50.

But Bieber and her companies were undeterred.  In 2019 and 2020, they tried again, filing a variety of intent-to-use trademark applications, including HAILEY RHODE for clothing and RHODE for beauty and cosmetics.  Compl. ¶¶ 51-52.  Although no product release appeared imminent, Rhode was concerned, and thus contacted Defendants' counsel to explain the likely confusion that would result from Defendants' apparent plans.  Compl. ¶ 53; Khatau Decl. ¶ 26 & Ex. 14.  Defendants' counsel stridently disclaimed any confusion, making it clear that Defendants would bully forward no matter what.  Compl. ¶ 54; Khatau Decl. ¶ 26 & Ex. 15.  But Defendants did, consistent with their prior abandonment of their application for use of "rhode" with clothing, assure Rhode that they would not sell "rhode"-branded clothes.  Compl. ¶ 54; Khatau Decl. ¶ 27.

In the midst of the uncertainty caused by the COVID pandemic, and unsure whether Defendants would ever actually bring any product line to market, Rhode decided not to incur further legal fees fighting a corporate behemoth.  Khatau Decl. ¶ 27.  Rhode informed Defendants that it reserved the right to contest any future use of RHODE if it caused confusion with Rhode's brand, indicating that it would continue to monitor the situation.  Khatau Decl. ¶ 27.

---

[1] For ease of reference, this memorandum calls Rhode's mark "RHODE" and Defendants' infringing mark "rhode."  Both marks, however, would be registered identically as "RHODE."

Recently, however, Rhode learned that Defendants had a launch planned for June 2022. Khatau Decl. ¶ 28.  Not only that, Rhode also learned that Defendants had filed an application to register a "rhode" mark in International Class 25 for use on clothing and a wide-ranging variety of other goods and services, from photographic instruments and computers, to bags, leather goods, and luggage, to advertising and promotional uses.  Compl. ¶ 55.

Upon learning of Defendants' intended launch, Rhode again reached out to Defendants' counsel in the hope of having a discussion to avoid the inevitable confusion from Defendants' use of "rhode."  Khatau Decl. ¶ 30.  Rhode explained that, in light of Bieber's celebrity, the risk that Rhode's brand would be subsumed and damaged was enormous.  Khatau Decl. ¶ 30 & Ex. 18.  Defendants' counsel dismissed Rhode's concerns.  Khatau Decl. ¶ 30 & Ex. 19.  Defendants would do whatever they felt like doing.

### Defendants launch their brand under the RHODE Marks.

On June 15, 2022, Defendants launched a celebrity beauty product line of skin care products branded "rhode."  Compl. ¶ 42.  Defendants also use that mark on apparel for promotional purposes.  Compl. ¶ 90.  Bieber, a well-known model and social media icon, is the face of Defendants' brand.  Compl. ¶ 58.  Over 45 million Instagram users follow her account. Compl. ¶ 58.  And both leading up to and after the launch, she used every bit of her vast reach to inundate the market with her own "rhode"-branded products.



Compl. ¶¶ 60-61, 90; Khatau Decl. ¶¶ 34-35.  These posts have received enormous attention.

The first, which Bieber captioned "@rhode is getting closer by the day," received over 1.1

million "likes."  Compl. ¶ 60.  The second, a collaboration between Bieber's account and the

@rhode Instagram account, received more than 600,000 likes.  Compl. ¶ 61.  The third image,

which shows Bieber wearing RHODE-marked clothing, has been re-posted many times:



Compl. ¶ 90.  Defendants have also promoted the mark on their website, rhodeskin.com.  Compl.

¶ 62; Khatau Decl. ¶ 36 & Ex. 22.  And Bieber's husband, the pop star Justin Bieber, has also

promoted the "rhode" skincare line on his social media accounts.  Compl. ¶ 63; Khatau Decl.

¶ 37.  His post reached his 243 million Instagram followers and garnered 1.5 million likes.

Compl. ¶ 63; Khatau Decl. ¶ 37.

***Consumer confusion has been immediate and widespread.***

Consumer confusion started even before the product launch.  Khatau Decl. ¶ 38.  That confusion was rampant online, where Instagram users, both prominent and private, mixed up the brands.  For instance, an Instagram account with over 2 million followers that identifies clothing worn by celebrities tagged Defendants' @rhode handle—rather than Rhode's @shoprhode handle—in a photo of actress Hilary Duff wearing a Rhode dress sold by Plaintiff:



Compl. ¶ 77.  As a result, when a user looking for that Rhode dress—like @mimichou22 above—clicks the tag on the image, they will be taken to Defendants' site rather than Rhode's. Compl. ¶¶ 77, 80.  Such misdirection is certain to result in lost sales to Rhode.  Khatau Decl. ¶¶ 39-43; Vickers Decl. ¶ 17.  Instances of such mis-tagging have already been prevalent. Compl. ¶ 79 (capturing half a dozen screen shots of additional examples).

Defendants also market their products to the same consumers who know and buy Rhode's goods.  Their email promotions, for instance, create a risk of confusion.  On June 14, 2022, both brands emailed their respective mailing lists within the same 30-minute span:

10



Compl. ¶ 74; Vickers Decl. ¶ 18.

Defendants' marketing blitz has showed an utter lack of regard for Rhode. Defendants led an Instagram Live event titled "shop rhode with hailey"—mimicking exactly Rhode's @shoprhode handle and website url. Compl. ¶ 81; Khatau Decl. ¶ 51; Vickers Decl. ¶ 25. Defendants have also used the "on the rhode" tag line on their website and in customer emails, even though Rhode has used the hash tag #ontherhode since its inception. Compl. ¶¶ 82-84; Khatau Decl. ¶¶ 52, 56 & Ex. 39; Vickers Decl. ¶¶ 6-8, 26 & Exs. 3-5. Photographs of Bieber promoting her skincare line have also made the rounds, prompting consumers to ask Rhode whether it sells Bieber's clothing:



Compl. ¶ 85; Vickers Decl. ¶ 27.  Consumers are broadly continuing to confuse the brands

online, assuming Rhode sells Bieber's clothing or that Bieber will sell clothing herself.  Compl.

¶ 85; Khatau Decl. ¶ 57.  Rather than clarify the confusion, Bieber has posted images in

RHODE-marked clothing and promised fans that Defendants will expand into Rhode's core

market: "Clothes will come:)".  Compl. ¶¶ 90, 92-94; Khatau Decl. ¶ 50; Vickers Decl. ¶ 24.



Rhode's own partners have been confused, too; stores that have carried Rhode's wares assumed it had some involvement with Defendants' line, expressing frustration for being left out of the loop. One store owner wrote to a Rhode sales agent: "I saw that Rhode is coming out with a skincare line and hailey Bieber is the spokesperson…? Is it going to be [direct-to-consumer] or are we going to be able to buy it and sell it as well? Nobody mentioned it to me in the showroom and it's all over social media, I wish someone would've let me know." Compl. ¶ 86.

Multiple people, including potential customers, have already reached out to Rhode's founders to question their relationship with Defendants' line and express their confusion. Compl. ¶¶ 85-59; Khatau Decl. ¶¶ 44, 53-55, 57; Vickers Decl. ¶¶ 19, 28. In fact, Rhode has begun receiving customer service emails from Defendants' customers with questions about Defendants' goods. Khatau Decl. ¶ 56.

### *Rhode is suffering ongoing harm from Defendants' use of its mark.*

The consequences of Defendants' infringement have materialized in the days leading up to and since Defendants' launch. *See generally* Compl. ¶¶ 95-107. With a celebrity as high

profile as Bieber as the face of the brand, Defendants have been able to inundate the market with their own "rhode" name.  Even before Defendants launched, social media platforms like Instagram—which are critical to marketing and sales—gave them priority, granting Bieber the verified @rhode handle.  Compl. ¶ 65; Khatau Decl. ¶ 33.  The algorithms will inevitably side with Bieber, too.  The day before Defendant's launch, Rhode was the first Google result for a "rhode" search:



The day after, Rhode was buried by Bieber:



Compl. ¶ 73.

Khatau and Vickers are not celebrities.  But they are savvy businesspeople who are keenly aware of what Defendants' conduct means for their brand.  *See* Khatau Decl. ¶¶ 59-62; Vickers Decl. ¶¶ 29-31.  Some consumers will think their products are Bieber's.  Some consumers will think Bieber's products are theirs.  Some will think they are all collaborating. Some will think Rhode is an infringer.  Some will hear of Rhode, but be unable to find its products on an internet that favors celebrity over all else.  Retail stores and potential collaborators concerned about confusing their own consumers or angering Defendants will see

little choice but to side with the bigger brand, too.  And Rhode's own plans to expand will be scuttled by an inability to leverage their mark in markets saturated with Bieber.  As Khatau explains, without the celebrity firepower to fight back, Defendants will "essentially kill our brand."  Khatau Decl. ¶ 59.  In light of Defendants' continued infringement and the threat it poses to Rhode, Rhode has been forced to bring suit and seek this preliminary injunction.

## ARGUMENT

To obtain a preliminary injunction, the movant must establish "'(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly toward the party requesting the preliminary relief.'" *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009).  Because a plaintiff "shall be entitled to a rebuttable presumption of irreparable harm … upon a finding of likelihood of success on the merits for a [trademark law] violation," 15 U.S.C. § 1116(a), we turn first to the merits.

## I.   RHODE IS LIKELY TO SUCCEED ON THE MERITS.

Rhode asserts trademark infringement claims under §§ 32 and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a), and New York common law.  The elements for these causes of action are the same:  A plaintiff must show (a) that it owns a mark entitled to trademark protection; and (b) that the "defendant's use of the mark is likely to cause consumers confusion as to the origin or sponsorship of the defendant's goods."  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (Lanham Act elements); *Van Praagh v. Gratton*, 993 F. Supp. 2d 293, 302 (E.D.N.Y. 2014) (elements of common law claims "mirror the Lanham Act claims").

Rhode easily satisfies each element.  Indeed, it is hard to imagine a clearer case of

"reverse confusion," in which a powerful junior trademark user's use so dwarfs the senior user's that consumers are likely to be left with "the misimpression that the junior user is the source of the senior user's goods." *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir. 1988) (citing J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1 (5th ed. 2022)).  Simply put, Bieber is so famous that her use of "rhode" will inevitably swamp Rhode's use of its own mark, threatening "'product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'"  *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021) (quoting *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)).  And the independent strength of Rhode's mark also creates the likelihood of *forward* confusion, as those who know the RHODE brand may mistakenly believe that Bieber's "rhode"-branded products are sold or endorsed by Rhode. *Thoip v. Walt Disney Co.*, 736 F. Supp. 2d 689, 694 (S.D.N.Y. 2010) (nothing that reverse and forward confusion are "not mutually exclusive").  These two independent sources of confusion both make success on the merits likely.

A.     **Rhode Owns Protectable Marks.**

The RHODE Marks are protectable.  Rhode has used RHODE to identify its clothing line since 2014.  Over the years, its use of RHODE has expanded such that it now owns three U.S. trademark registrations for use of the word mark RHODE on clothing (Reg. No. 5286239), handbags (Reg. No. 6267443), and textiles, children's and women's clothing, hair accessories, dolls, puzzles, and holiday ornaments (Reg. No. 6539188).  Because a trademark registration "entitles the owner to a presumption that [the] mark is valid," *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000), Rhode's registrations constitute prima facie evidence that RHODE is entitled to protection.

In addition, as explained in greater detail below (at 18-20), RHODE is an inherently distinctive mark because it is "arbitrary"—that is, it "neither describe[s] nor suggest[s] anything about the product." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221 (3d Cir. 2000). Such marks are entitled to strong trademark protection because they have the capacity to designate the user as the origin of goods. *See BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 198 (S.D.N.Y. 2000). Rhode has also used the hashtag "#ontheRhode" since 2014, which is also an arbitrary mark when used in connection with the goods Rhode sells, entitling that unregistered mark, too, to common law protection.

**B.     Defendants' Use Of The Mark Is Highly Likely To Cause Confusion.**

To evaluate the likelihood of confusion, courts use the familiar eight-factor test set out in *Polaroid Corp. v. Polarad Elecs. Corp.*:

> [1] the strength of [the] mark, [2] the degree of similarity between the two marks, [3] the proximity of the products, [4] the likelihood that the prior owner will bridge the gap, [5] actual confusion, … [6] defendant's good faith in adopting its own mark, [7] the quality of defendant's product, and [8] the sophistication of buyers.

287 F.2d 492, 495 (2d Cir. 1961); *see Banff*, 841 F.2d at 489-93 (applying *Polaroid* in reverse confusion case). "No single factor is dispositive." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004). Courts consider the mix of factors to answer the "'ultimate question of whether consumers are likely to be confused.'" *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000).

*The RHODE Marks are conceptually and commercially strong, but cannot match Defendants' commercial strength.* The strength of a mark refers to its capacity to act as a designation of the source of a good or service. The strength of a mark "depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *Savin*

*Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004).  In evaluating distinctiveness, courts

consider both the mark's inherent distinctiveness—*i.e.*, its conceptual strength—and its

distinctiveness in the marketplace—*i.e.*, its commercial strength.  *Hope Organics LLC v. Preggo

Leggings LLC*, No. 21-CV-2416, 2021 WL 5919367, *3 (S.D.N.Y. Dec. 15, 2021).

RHODE is inherently distinctive as used with women's clothing, handbags, and home

goods.  Trademarks are divided into four classes with respect to protection, "[a]rrayed in an

ascending order which roughly reflects their eligibility to trademark status and the degree of

protection accorded": "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful."

*Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (Friendly, J.).

Rhode's use of RHODE is a quintessentially "[a]rbitrary or fanciful" mark, as it "neither

describe[s] nor suggest[s] anything about the product."  *A & H Sportswear*, 237 F.3d at 221.  In

both the forward confusion and reverse confusion contexts, significant conceptual strength

makes confusion likely.  *Id.*; *see also H. Lubovsky, Inc. v. Espirit de Corp.*, 627 F. Supp. 483

(S.D.N.Y. 1986) (same).[2]

RHODE has also acquired commercial strength—the hard way.  Khatau and Vickers had

no celebrity capital or cadre of corporate ventures on which to build their brand.  But they

developed a unique aesthetic and market position, growing the company's sales many times

over.  They achieved such astounding success—in a hyper-competitive industry, and through a

global pandemic—by consistently delivering high-quality, recognizable products to a loyal and

---

[2] Notably, Defendants' use of "rhode" has less inherent source-identifying capacity because it is Hailey Bieber's middle name, which thus makes the mark "descriptive."  *See Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987) ("[A] personal name[] is a descriptive mark.") (collecting cases).  Defendants thus seek to use their comparatively enormous *commercial* power to inundate the market with a "rhode" that threatens to displace a trademark that is entitled to greater solicitude under the trademark law.

expanding customer base that seeks its products out in store and online.  *See supra* 3-5.  Rhode's commercial strength weighs firmly in favor of a finding of forward confusion.

But it is Defendants' comparatively huge commercial platform that makes *reverse* confusion so certain.  Bieber has promoted her "rhode"-branded products to over 45 million followers on her Instagram account, and her husband Justin has posted to his 243 million followers.  *See supra* 7-9.  The launch has also featured an Instagram account for rhode (@rhode) that amassed 247,000 followers before it launched, Compl. ¶ 59, Instagram posts with more than 1,000,000 likes,[3] favorable press coverage in *Elle*, *Seventeen*, and *Teen Vogue*,[4] and a full-length cover story in *Allure*.[5]  By comparison, Rhode's Instagram account (@shoprhode) currently has 190,000 followers, and the brand has not yet attracted a comparable level of press attention.  The "hallmark of a reverse confusion case" is "the relatively large advertising and promotion of the *junior* user."  *A & H Sportswear*, 237 F.3d at 230 (quoting J. Thomas McCarthy, *supra,* § 23:10).  Here, Defendants' "aggressive advertising efforts" and "ability to 'saturate' the market with their mark," *Thoip*, 788 F. Supp. 2d at 188, mean that Defendants are "apt to drown out the moderate success of" Rhode, leading to both reverse and forward confusion, *Thoip*, 736 F. Supp. 2d at 694.

**The marks are identical.**  In considering the similarity of the marks, "courts must assess

---

[3] *See* Hailey Bieber (@haileybieber), Instagram, https://www.instagram.com/p/CejOBjAFF1D/ (last visited June 14, 2022).

[4] George Driver, *Everything You Need To Know About Hailey Bieber's Skincare Line Rhode*, Elle (June 9, 2022), https://tinyurl.com/murwzcjn; *Abby Dupes & Leah Campano*, *Everything We Know About Hailey Bieber's Skincare Brand, Rhode*, Seventeen (June 15, 2022), https://tinyurl.com/mr2s8sf9; Lauren Rearick, *Hailey Bieber's Rhode Brand: Everything We Know So Far*, Teen Vogue (Apr. 8, 2022), https://tinyurl.com/2p92b6j9.

[5] Darian Symoné Harvin & Zoey Grossman, *Hailey Bieber Knows You're Sick of Celebrity Beauty Brands*, Allure (May 2022), https://tinyurl.com/2kweecmp.

whether the 'overall impression' created by the marks at issue in relation to the 'context in which they are found' is likely to confuse prospective customers." *Thoip*, 736 F. Supp. 2d at 710 (quoting *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 384 (S.D.N.Y. 2008)).  This is a "holistic consideration that turns on the marks' sight, sound, and overall commercial impression." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 334 (S.D.N.Y. 2013).

Here the marks are textually and aurally identical. *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 304-05 (S.D.N.Y. 2021) (alterations omitted) (finding likelihood of consumer confusion "when the dominant words in two marks are the same"); *Akiro*, 946 F. Supp. 2d at 334 (finding likelihood of confusion for two marks that "sound similar").  Moreover, the two marks—indisputably identical when rendered in "standard typestyle"—retain certain "striking ... visual similarities" even when they are rendered in their typical typefaces. *Banff*, 841 F.2d at 492.  Both marks are rendered in a sans-serif typeface, which "exacerbates the like impression created by the two labels." *Id.*

The only notable visual difference between the two marks is that Rhode tends to use all capitals ("RHODE"), whereas Defendants tend to use all lower case ("rhode").  But whatever distinction that might suggest to someone closely evaluating the marks side-by-side, "'the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone.'" *Akiro*, 946 F. Supp. 2d at 334.  Such a consumer would.  And in any event, third-party media, social media participants, and search engines cannot be expected to consistently follow capitalization conventions like these. *Cf. supra* 10.

**The products are in closely related markets.**  The third factor "concerns whether and to what extent the two products compete with each other" and "the nature of the products

21

themselves and the structure of the relevant market." *Morningside Grp. Ltd. v. Morningside Cap. Grp.*, 182 F.3d 133, 140 (2d Cir. 1999) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)).  "[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enters.*, 335 F.3d at 150.  The two product markets do not have to be identical, or even similar—the question is simply "whether [a] consumer might ... reasonably conclude that one company would offer both of [the] products." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 481 (3d Cir. 1994) (finding trademark infringement despite lack of direct competition between the parties).

Here, although the parties' products are not yet in direct competition, they operate in "related" markets, which weighs in favor of likelihood of confusion.  Two markets are "related" if "customers are likely to think that the infringer's goods come from the same source as the senior user's goods" or, at minimum, are "affiliated with or connected with the senior user." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 336 (S.D.N.Y. 2010). The market for beauty products (like cosmetics) and the market for fashion items (like clothing, bags, and shoes) are "closely related," such that reasonable consumers could conclude—and have concluded—that RHODE clothing and "rhode" beauty products shared the same origin. *See supra* 10, 12.  Indeed, email promotions for Rhode's and Defendants' products have already been targeted at the same consumers.  *See supra* 11 (screenshot of promotional emails from RHODE and "rhode" arriving within same hour).

Cross-over is common and expected between the market for beauty products and the market for fashion products—especially when it comes to celebrity brands.  *See, e.g.*, *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1174-75 (2d Cir. 1976) (holding that clothing

and cosmetics were "by their nature ... closely related" markets).  In general, brands like Chanel, Dior, and Tom Ford have expanded across clothing, footwear, beauty, fragrance, skincare, and lifestyle goods, as have celebrity brands by Gwyneth Paltrow, Kim Kardashian, Kylie Jenner, and Rihanna.  Compl. ¶ 102.  And for brands like Rhode, Khatau explains, cross-over often happens in the form of collaborations with cosmetics brands—for example, between cosmetics brand Aveda and fashion brand 3.1 Phillip Lim, or between Sephora and Mara Hoffman.  Khatau Decl. ¶ 22.

Rhode's fashion products and Defendants' skincare products are also likely to be promoted and sold through similar—if not identical—sales channels.  *See Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 491 (S.D.N.Y. 2004) (comparing the products' "target clientele" and "typical distribution channels").  Both types of products rely heavily on online marketing and sales, where similar demographics will shop for clothing, accessories, and skincare products alike.  And Rhode also sells its products through various websites and brick-and-mortar retailers, like department stores, that sell both clothing and skincare products.  This factor too favors finding a likelihood of confusion.

***Rhode is likely to bridge the gap—and so are Defendants.***  Likelihood of "bridging the gap"—a closely related factor—examines "whether the senior user of the mark is likely to enter the market in which the junior user is operating."  *Tri–Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 356 (S.D.N.Y. 1998) (internal quotation marks omitted).  To begin with, as the Second Circuit explained in *Scarves by Vera*, the fashion and beauty marks are "so closely related" to the market for apparel that any gap is vanishingly small, and there is thus "no need to decide whether there [was] a substantial likelihood that plaintiff [would] enter the cosmetics ... market."  544 F.2d at 1174.  Confusion exists without cross-over.

In any event, Rhode is likely to bridge the gap. As Khatau explains, Rhode's "collaborators [have] asked us specifically if we could add some cosmetics products," and "it is a natural and expected extension and a step we hoped to take in the future." Khatau Decl. ¶ 21. This is hardly fanciful. Rhode has already expanded from women's clothing to handbags and home goods. Rhode also has pending trademark applications for use of RHODE with products that are in development, including footwear, men's clothing, sunglasses, jewelry, and housewares. *Supra* 5. Rhode has not stood still since its inception, and it has no plans of doing so now.

Meanwhile, Defendants have given every indication that they plan to expand beyond the narrow category of beauty products. Defendants sought registration in a variety of other goods (described above at 7), including everything from bags, cash registers, diving gear, pocket wallets, shop window dressing, and search engine optimization. Even after assuring Rhode they would not sell clothing in particular under the RHODE brand and withdrawing their application for clothing when Rhode's marks were cited against them, they recently have filed a new trademark application seeking registration in International Class 25 for clothing. Compl. ¶ 55. And Defendants have already affixed the infringing "rhode" mark to clothing in photos online. Although they claim those items are promotional and that they are not selling clothing under the mark, the consumers seeing those clothing items certainly do not know that. To the contrary, Bieber's fans assume that she will, and even already does, sell clothing. *Supra* 9.

Perhaps most shocking, Rhode has located a TikTok comment where Bieber herself expressly promises fans that her empire will reach clothes: In response to a user video proposing Bieber should sell clothing under the label "rhode," Bieber commented "Clothes will come :)". *Supra* 12-13. Bieber's horizons are set even further: She has already spoken about turning her

24

"rhode" brand into a lifestyle brand, just as Rhode has been doing for the better part of a decade. *See* Vickers Decl. ¶ 23.

It is well recognized that a principal harm in reverse confusion cases is the hindrance of a senior user's "'ability to move into new markets.'" *Ironhawk Techs.*, 2 F.4th at 1160.  That harm is highly like to materialize here.

***Consumers are already confused.***  "[E]vidence of actual confusion, where shown, is highly probative of the likelihood of confusion." *Sunenblick v. Harrell*, 895 F. Supp. 616, 630 (S.D.N.Y. 1995).  "Proof of actual confusion may take the form of direct evidence, such as anecdotal evidence by consumers." *Id.*  Here, such direct evidence exists.  *See generally supra* 10-13.  On Instagram, Rhode's clothing has regularly been tagged with Defendants' Instagram handle (@rhode) rather than Rhode's Instagram handle (@shoprhode).  For instance, when an Instagram user asked Fashion Bomb Daily—an Instagram account with 2 million followers—to "find [the] dress" actress Hilary Duff was wearing in a promotional photo, the account tagged Defendants even though the dress was made by Rhode.  To make matters worse, any Instagram user who clicked that tag in search of Rhode's dress was taken to Defendants' page.  *Supra* 10.  That misattribution and direction is happening all over the web:



Compl. ¶ 79.   Rhode's founders have already been asked whether they have any relationship to

Defendants' "rhode" beauty line, by everyone from friends to sales reps to consumers

themselves.  *E.g.*, Compl. ¶ 87 (comment asking Rhode, "Where do I find your new skincare []

line[]?"); Compl. ¶ 86 (message from buyer saying "I saw that Rhode is coming out with a

skincare line and hailey Bieber is going to be the spokesperson…?"); Compl. ¶ 87 (customer service inquiry about Defendants' product sent to Rhode).

"[T]here can be no more positive proof of likelihood of confusion" than such instances of actual confusion. *Sunenblick*, 895 F. Supp. at 630; *see also Morningside Grp. Ltd.*, 182 F.3d at 143 ("[If consumers] have already been *actually* confused, it cannot be gainsaid that others in the same market are *likely* to be confused."). Accordingly, this factor strongly favors finding a likelihood of confusion.

**Defendants adopted the RHODE Marks in knowing disregard of Rhode's rights.** In a reverse confusion case, a plaintiff need not show that the junior user specifically intended to capitalize on plaintiff's good will, because "typically . . . neither junior nor senior user wishes to siphon off the other's goodwill." *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017). Rather, the question under this factor is whether the defendant somehow "culpably disregarded the risk of reverse confusion." *Id.* at 934-35. Such intent can be shown in many ways—"by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion." *Id.* Ordinarily, "[t]he inquiry into a defendant's intent is resolved by determining whether the alleged infringer has selected a similar or identical mark with *knowledge* of the senior user's mark." *Sunenblick*, 895 F. Supp. at 632 (emphasis added).

Here, it is indisputable that Defendants had actual knowledge of Rhode's identical mark—in 2018, clearly knowing that they had an issue with possible confusion, they contacted Rhode seeking to purchase the rights to RHODE trademarks owned by Rhode. Defendants even abandoned their application to use RHODE for a line of clothing. When Defendants later filed

new applications, Rhode's counsel wrote them with concerns about likelihood of confusion and asked that they cease all use of the "rhode" mark, adding that Rhode would seek redress if Defendants went ahead to use "rhode" in a way likely to cause confusion with RHODE.  *Supra* 6.

　　While it is certainly understandable that Defendants wish to use Hailey Bieber's middle name to brand her products, modern trademark decisions have expressly repudiated the notion that one has a "sacred right" to use one's own name as a mark.  *Scarves by Vera*, 544 F.2d at 1173 ("[E]ven when the mark in question is the name of the junior user, his right to use the name on his products may be limited….").  The fact is that Defendants knew that Rhode was already using RHODE and had been for some time, which means that when Defendants adopted RHODE for skincare, they "disregarded the risk of reverse confusion."  *Marketquest Grp., Inc.*, 862 F.3d at 935.  Accordingly, Defendants' decision to knowingly appropriate an identical mark in disregard of Rhode's rights strongly supports a finding of likelihood of confusion.

　　As for forward confusion, there is reason to believe that Defendants have and are continuing to wield their mark with the intent to confuse the public.  In her Instagram live stream launching the brand, Bieber used the slogan "shop rhode," which is both Rhode's Instagram handle and its website.  *See supra* 11.  And Defendants' website, rhodeskin.com, invites users to join them "on the rhode," which has been Rhode's Instagram hashtag since its inception in 2014.  *See supra* 11.  This evidence of intent to deceive weighs in favor of a finding of likelihood of forward confusion.

　　***Rhode's and Defendants' products differ in quality and aesthetics.***  "This factor is primarily concerned with whether the senior user's reputation could be jeopardized" by differences in the nature or quality of the parties' products.  *Arrow Fastener Co. v. Stanley*

*Works,* 59 F.3d 384, 398 (2d Cir. 1995).  The underlying concern is one of harm to the senior

mark's goodwill.  *See, e.g.*, *Virgin Enters.,* 335 F.3d at 152.

    Although Rhode has no reason to question the quality of Defendants' products,

Defendants' marketing and design strategy is "inconsistent with the image [Rhode] wishes to

project."  *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523-24 (S.D.N.Y. 2009); *see also Dallas*

*Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) ("The

trademark laws are designed not only to prevent consumer confusion but also to protect 'the

synonymous right of a trademark owner to control his product's reputation.'").  Here, Rhode has

carefully cultivated a high-end brand with a honed aesthetic.  Rhode is available in department

stores like Saks Fifth Avenue, Nieman Marcus, and Bergdorf Goodman, and it is regularly worn

by celebrities like Beyoncé, Rihanna, Lupita N'yongo, and Debra Messing.  If Defendants are

permitted to saturate the market with their brand through Bieber's immense online following,

this would undermine Rhode's established reputation and curated aesthetic.  This factor therefore

weighs in favor of finding a likelihood of confusion.

    ***Online consumers are unlikely to be discerning with respect to the products in***

***question.***  The final factor assesses the level of sophistication of consumers in the relevant

market.  "The more sophisticated the purchaser, the less likely he or she will be confused by the

presence of similar marks in the marketplace."  *Savin,* 391 F.3d at 461.

    The internet context broadly weighs in favor of finding a likelihood of confusion.

Because internet browsing "takes little effort" and allows for less ability to discern precisely

what one is purchasing, online shoppers "are more likely to be confused as to the ownership of a

web site than traditional patrons of a brick-and-mortar store would be of a store's ownership."

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000); *see also On-Line*

*Careline, Inc. v. Am. Online, Inc.*, 229 F. 3d 1080, 1087 (Fed. Cir. 2000) ("[T]here is no basis for concluding that Internet users are any more knowledgeable or sophisticated than the general public.").

Even sophisticated consumers, moreover, may be confused when two parties' marks and services are identical. *See Morningside Grp. Ltd.*, 182 F.3d at 143 ("It is clear in all events that when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." (internal quotation marks omitted)). In this case, the marks are textually identical. And when it comes to "identical" marks, "'even a highly sophisticated and discriminating class of consumers cannot be relied upon to allay confusion.'" *Pfizer*, 652 F. Supp. 2d at 524.

***

In sum, all eight of the *Polaroid* factors weigh in favor of finding a likelihood of confusion. As a result, Rhode is likely to succeed on the merits of its claim under both sections 32 and 43(a) of the Lanham Act and New York common law.[6]

## II.   RHODE IS FACING DEEPENING AND IRREPARABLE HARM.

"Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *New York City Triathlon*, 704 F. Supp. 2d at 343 (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas,*

---

[6] Although "the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable," *Tri–Star Pictures*, 14 F. Supp. 2d at 363, some courts have suggested that common law unfair competition claims "may require an additional element of bad faith or intent." *Girl Scouts v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 808 F. Supp. 1112, 1131 (S.D.N.Y.1992). To the extent such a showing is required, Defendants' conduct establishes this element for reasons discussed above (at 27-28).

*Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)).  In fact, the "[p]rospective loss of ... goodwill alone is sufficient to support a finding of irreparable harm."  *Id.*

As discussed above, where the movant has established a likelihood of consumer confusion or deception, the movant is entitled to a "presumption of irreparable harm," 15 U.S.C. § 1116(a).  That presumption directly applies here because Rhode has shown that Defendants' "use of its mark creates a likelihood of consumer confusion, which leads to the presumption of irreparable harm."  *Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 382 (S.D.N.Y. 2018); *City of New York v. Lopez*, No. 21 CV 7862, 2021 WL 6063839, at *4-5 (S.D.N.Y. Dec. 21, 2021), *appeal filed*, No. 22-160 (2d Cir. 2022*)*; *Hope Organics*, 2021 WL 5919367, at *11-12.  Typically, the presumption of irreparable harm can be overcome only where a plaintiff's lengthy delay suggests a lack of genuine urgency.  Here, Rhode diligently alerted Defendants to the confusion it feared would occur if Bieber was able to launch a "rhode"-branded line.  And although it is a relatively small brand that must be exceedingly judicious in incurring significant litigation costs, Rhode has brought suit immediately after Defendants' product launch, at which point it became clear that this confusion was a virtual certainty.

Moreover, independent of the presumption, the irreparable harm that Rhode is currently facing is both palpable and immediate.  As Khatau and Vickers explain at length, consumers will be confused every which way by Defendants' "rhode"-branded products, destroying the goodwill they have worked to build.  Already, Rhode's goods have been misattributed to Defendants' "rhode" online, and Rhode's customers are inquiring about the two brands' connections.  Khatau Decl. ¶¶ 39-44, 55-57.  Some consumers are likely to think that Defendants' products were made by Rhode, and others will think that Rhode's products are made by Defendants, Khatau Decl. ¶ 59.  Consumers who encounter Defendants' use of "rhode" first may think that Rhode is the

infringer.  Khatau Decl. ¶ 59.  And many will think that Rhode, a long-established brand, is

merely an offshoot or affiliate of Bieber's celebrity-product empire.  Control over the mark

Rhode spent nine years building "would be out of its hands."  *U.S. Polo Ass'n, Inc. v. PRL USA*

*Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013);

*accord Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38,

43 (2d Cir. 1986) ("[I]rreparable harm exists in a trademark case when the party seeking the

injunction shows that it will lose control over the reputation of its trademark pending trial."

(quotation marks omitted)).

Meanwhile, Defendants' market saturation threatens Rhode's expansion.  As Khatau

explains, large stores or websites may favor Defendants over Rhode.  Khatau Decl. ¶¶ 60-61.

Defendants' use also threatens to block Rhode's expansion into new product markets, especially

as Defendants grow their company into a lifestyle brand—just as Rhode has been planning to do

for years.  Khatau Decl. ¶ 12; Vickers Decl. ¶ 23.  The harms of these missed opportunities for a

growing brand are immeasurable.  Khatau ¶¶ 59-62.

These sorts of harms are inherently difficult to quantify, which is why the presumption of

irreparable harm flowing from confusion exists in the first place.  And Rhode has little ability to

combat them.  Rhode lacks Bieber's star power and reach, and social media and search engines

have already given themselves over to Defendant's rhode-based products.  *Supra* 13-15.  And in

today's expansive and viral social media environment, every day that Defendants are allowed to

use the infringing mark will diminish the value of RHODE.

The irreparable harm factor weighs strongly in favor of the requested relief.

## III.   THE BALANCE OF EQUITIES TIPS DECIDEDLY IN RHODE'S FAVOR.

Largely for the reasons already discussed, the balance of the equities also tips decidedly

toward Rhode.  As discussed above, to build their brand, Khatau and Vickers took enormous

personal risks, leaving steady jobs and devoting their lives to Rhode.  Vickers ¶ 34.  RHODE is

the company's most significant asset.  But through no fault of its own, Rhode's vision and

success—not to mention the control of its reputation and goodwill—would disappear virtually

overnight.  Unlike someone with the fame, fortune, and following of Bieber, Rhode does not

have the wherewithal to instantly pivot to a new name or venture.  All of Khatau's and Vickers's

work simply gets washed under.

        Defendants, by contrast, just launched their "rhode" line days ago.  The line is but the

latest potentially lucrative venture for an already immensely successful and famous celebrity.

While Bieber plainly places substantial value on use of the mark, given her celebrity and

following, Defendants could have selected any number of other brand names and still can do so.

Indeed, Defendants attempted to register a host of other names, including HRB3, Bieber Beauty,

Moodboard, HB Beauty by Hailey Bieber, HR Beauty, Dew Beauty, Dewy Beauty, HRB, Hailey

Baldwin, and Hailey Bieber.  Khatau Decl. ¶ 58.  At most, the only harm that could conceivably

befall Defendants is the temporary "loss of profits on sales" until a new mark is selected, which

is a "quantifiable" and thus compensable harm—very much unlike the "loss of consumer

goodwill" that Rhode will continue to face.  *Hope Organics*, 2021 WL 5919367, at *13 (quoting

*Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996)); *see also Museum of

Mod. Art*, 339 F. Supp. 3d at 383 (concluding that plaintiff's unquantifiable loss of reputation

and goodwill outweighed plaintiff's quantifiable and compensable economic losses, even if

substantial); *Diesel Props S.R.L. v. Greystone Business Credit II LLC*, No. 07-CV-9580, 2008

WL 594773, at *5 (S.D.N.Y. Mar. 5, 2008) (same).

        In any event, any harm that will befall Defendants is of their own making.  They knew of

Rhode's use of the RHODE Marks, but rejected Rhode's entreaties to work out a solution to

avoid this confusion.  *Supra* 6-7.  "[C]onsidering the lack of good faith on the part the

defendant[s], including launching the ["rhode"] brand after being notified about the [RHODE]

brand, any 'quantifiable' harm that defendant may face was avoidable."  *Hope Organics*, 2021

WL 5919367, at *13.  In fact, "it is 'axiomatic that an infringer ... cannot complain about the loss

of ability to offer its infringing product.'" *Off-White, LLC v. Alins*, No. 19 Civ. 9593, 2021 WL

4710785, at *5 (S.D.N.Y. Oct. 8, 2021) (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d

Cir. 2012)).

Through Rhode's requested preliminary injunction, Defendants will be in no way

precluded from selling their products or services.  Nor would Bieber be prevented from

accomplishing her vision for the brand.  She will simply need to switch from the infringing name

that Defendants have used for mere days to one of many noninfringing marks that could, and

should, have been selected in the first place.  The equities thus strongly, if not overwhelmingly,

favor Rhode.  *See, e.g.*, *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 (equities favored the plaintiff

where it had sold men's fragrances bearing its mark for years and had multiple registered

trademarks and, "[t]he substantial likelihood of consumer confusion and potential loss to

[plaintiff] both in terms of sales and reputation threaten to cause … serious harm," and the

defendant "ha[d] yet to enter the fragrance market in earnest"); *Les Ballets Trockadero De Monte

Carlo, Inc. v. Trevino*, 945 F. Supp. 563, 574 (S.D.N.Y. 1996) (equities favored the plaintiff

where the defendant's ballet company would not be prevented from performing under a different

name).

## IV.    RHODE'S REQUESTED RELIEF IS IN THE PUBLIC INTEREST.

The requested relief here advances the public's "strong interest in preventing consumer

confusion and protecting federally registered trademarks." *City of New York*, 2021 WL 6063839, at *5 (citing *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 502 (S.D.N.Y. 2013)). Put simply, a preliminary injunction serves the public's "interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *New York City Triathlon*, 704 F. Supp. 2d at 344; *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193 (1985) ("[A] sound public policy requires that trademarks should receive nationally the greatest protection that can be given them."); *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 ("The consuming public has a protectable interest in being free from confusion, deception and mistake.").

That interest is uniquely strong in this case. Rhode's two women co-founders built a brand from nothing. They had no name recognition to bank on and no portfolio of other ventures to catch them if their business failed. But they believed in their vision and made it real. Their investment and their goodwill are the epitome of what trademark law is designed to protect.

Bieber's product launch threatens to destroy nine years of work in an instant. Rhode's brand stands little chance against Bieber's massive following, innumerable resources, and willful disregard of Rhode's rights. And the public loses out, because while Bieber could still successfully bring her products to the marketplace under another name, Rhode must depend on the one it has built—and will suffer deeply from consumer confusion and possibly the extinction of its brand.

## CONCLUSION

For the foregoing reasons, and upon the facts set forth in the Verified Complaint and accompanying Declarations of Purna Khatau and Phoebe Vickers, Plaintiff Rhode respectfully requests that the Court grant its motion pursuant to Rule 65 of the Federal Rules of Civil

Procedure, for an order preliminarily enjoining Defendants' ongoing trademark and trade name infringement, and unfair competition.

Dated: June 21, 2022                     Respectfully submitted,
        New York, New York

                                         _____
                                         Lisa T. Simpson
                                         Christopher J. Cariello
                                         Rochelle F. Swartz
                                         ORRICK, HERRINGTON
                                           & SUTCLIFFE LLP
                                         51 West 52nd Street
                                         New York, NY  10019
                                         (212) 506-5000

                                         *Attorneys for Plaintiff*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION .................................................................................................... 1

FACTUAL BACKGROUND ..................................................................................... 3

    *Khatau and Vickers build the RHODE brand from scratch.* ................................ 3

    *Defendants adopt the RHODE Marks despite Rhode's efforts at resolution.* ........ 5

    *Defendants launch their brand under the RHODE Marks.* ................................... 7

    *Consumer confusion has been immediate and widespread.* ................................ 10

    *Rhode is suffering ongoing harm from Defendants' use of its mark.* .................. 13

ARGUMENT ........................................................................................................... 16

  I.    RHODE IS LIKELY TO SUCCEED ON THE MERITS. ................................. 16

      A.    Rhode Owns Protectable Marks. ............................................................. 17

      B.    Defendants' Use Of The Mark Is Highly Likely To Cause
            Confusion. ............................................................................................. 18

  II.    RHODE IS FACING DEEPENING AND IRREPARABLE HARM. ................ 30

  III.    THE BALANCE OF EQUITIES TIPS DECIDEDLY IN RHODE'S
      FAVOR. ....................................................................................................... 32

  IV.    RHODE'S REQUESTED RELIEF IS IN THE PUBLIC INTEREST. ............... 34

CONCLUSION ........................................................................................................ 35

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
    237 F.3d 198 (3d Cir. 2000)...................................................................18, 19, 20

*Abercrombie & Fitch Co. v. Hunting World, Inc.*,
    537 F.2d 4 (2d Cir. 1976)...........................................................................19

*Akiro LLC v. House of Cheatham, Inc.*,
    946 F. Supp. 2d 324 (S.D.N.Y. 2013)......................................................21

*Ameritech, Inc. v. Am. Info. Techs. Corp.*,
    811 F.2d 960 (6th Cir. 1987) ....................................................................17

*Arrow Fastener Co. v. Stanley Works*,
    59 F.3d 384 (2d Cir. 1995).........................................................................28

*Banff, Ltd. v. Federated Dep't Stores, Inc.*,
    841 F.2d 486 (2d Cir. 1988)................................................................17, 18, 21

*BigStar Ent., Inc. v. Next Big Star, Inc.*,
    105 F. Supp. 2d 185 (S.D.N.Y. 2000).......................................................18

*Brennan's, Inc. v. Brennan's Rest., L.L.C.*,
    360 F.3d 125 (2d Cir. 2004)......................................................................18

*Cadbury Beverages, Inc. v. Cott Corp.*,
    73 F.3d 474 (2d Cir. 1996)........................................................................22

*Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*,
    794 F.2d 38 (2d Cir. 1986)........................................................................32

*City of New York v. Lopez*,
    No. 21 CV 7862, 2021 WL 6063839 (S.D.N.Y. Dec. 21, 2021)........................31, 35

*Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*,
    604 F.2d 200 (2d Cir. 1979)......................................................................29

*Diesel Props S.R.L. v. Greystone Business Credit II LLC*,
    No. 07-CV-9580, 2008 WL 594773 (S.D.N.Y. Mar. 5, 2008)................................33

*Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*,
    30 F.3d 466 (3d Cir. 1994).........................................................................22

*Girl Scouts v. Bantam Doubleday Dell Publ'g Grp., Inc.*,
    808 F. Supp. 1112 (S.D.N.Y.1992)..................................................................30

*GoTo.com, Inc. v. Walt Disney Co.*,
    202 F.3d 1199 (9th Cir. 2000) ........................................................................30

*H. Lubovsky, Inc. v. Espirit de Corp.*,
    627 F. Supp. 483 (S.D.N.Y. 1986) .................................................................19

*Hope Organics LLC v. Preggo Leggings LLC*,
    No. 21-CV-2416, 2021 WL 5919367 (S.D.N.Y. Dec. 15, 2021) ..........................19, 31, 33, 34

*Ironhawk Techs., Inc. v. Dropbox, Inc.*,
    2 F.4th 1150 (9th Cir. 2021) .....................................................................17, 25

*Juicy Couture, Inc. v. Bella Int'l Ltd.*,
    930 F. Supp. 2d 489 (S.D.N.Y. 2013).............................................................35

*Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*,
    945 F. Supp. 563 (S.D.N.Y. 1996) ................................................................34

*Malletier v. Dooney & Bourke, Inc.*,
    561 F. Supp. 2d 368 (S.D.N.Y. 2008)............................................................21

*Marketquest Grp., Inc. v. BIC Corp.*,
    862 F.3d 927 (9th Cir. 2017) ...................................................................27, 28

*Morningside Grp. Ltd. v. Morningside Cap. Grp.*,
    182 F.3d 133 (2d Cir. 1999)................................................................21, 27, 30

*Museum of Mod. Art v. MOMACHA IP LLC*,
    339 F. Supp. 3d 361 (S.D.N.Y. 2018)........................................................31, 33

*N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*,
    704 F. Supp. 2d 305 (S.D.N.Y. 2010)......................................................22, 31, 35

*Nabisco, Inc. v. Warner-Lambert Co.*,
    220 F.3d 43 (2d Cir. 2000).............................................................................18

*Off-White, LLC v. Alins*,
    No. 19 Civ. 9593, 2021 WL 4710785 (S.D.N.Y. Oct. 8, 2021) ......................34

*On-Line Careline, Inc. v. Am. Online, Inc.*,
    229 F. 3d 1080 (Fed. Cir. 2000).....................................................................30

*Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*,
    469 U.S. 189 (1985)......................................................................................35

*Pfizer Inc. v. Sachs*,
    652 F. Supp. 2d 512 (S.D.N.Y. 2009) ............................................................29, 30

*Polaroid Corp. v. Polarad Elecs. Corp.*,
    287 F.2d 492 (2d Cir. 1961) ..........................................................................18

*Power Test Petroleum Distribs., Inc. v. Calcu Gas, Inc.*,
    754 F.2d 91 (2d Cir. 1985) ...........................................................................31

*Savin Corp. v. Savin Grp.*,
    391 F.3d 439 (2d Cir. 2004) ....................................................................18, 29

*Scarves by Vera, Inc. v. Todo Imports Ltd.*,
    544 F.2d 1167 (2d Cir. 1976) ...........................................................22, 23, 28

*Strange Music, Inc. v. Strange Music, Inc.*,
    326 F. Supp. 2d 481 (S.D.N.Y. 2004) ...........................................................23

*Sunenblick v. Harrell*,
    895 F. Supp. 616 (S.D.N.Y. 1995) ..........................................................25, 27

*Thoip v. Walt Disney Co.*,
    736 F. Supp. 2d 689 (S.D.N.Y. 2010) ...................................................17, 20, 21

*Tri–Star Pictures, Inc. v. Unger*,
    14 F. Supp. 2d 339 (S.D.N.Y. 1998) ..........................................................23, 30

*Two Hands IP LLC v. Two Hands Am., Inc.*,
    563 F. Supp. 3d 290 (S.D.N.Y. 2021) ...........................................................21

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011) ...................................................32, 34, 35

*Van Praagh v. Gratton*,
    993 F. Supp. 2d 293 (E.D.N.Y. 2014) ............................................................16

*Virgin Enters. Ltd. v. Nawab*,
    335 F.3d 141 (2d Cir. 2003) ...........................................................16, 22, 29

*Wal-Mart Stores, Inc. v. Samara Bros.*,
    529 U.S. 205 (2000) ...................................................................................17

*Warner-Lambert Co. v. Northside Dev. Corp.*,
    86 F.3d 3 (2d Cir. 1996) ..............................................................................33

*WPIX, Inc. v. ivi, Inc.*,
    691 F.3d 275, (2d Cir. 2012) .......................................................................34

*Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*,
　835 F.2d 990 (2d Cir. 1987)..................................................................................19

*Zino Davidoff SA v. CVS Corp.*,
　571 F.3d 238 (2d Cir. 2009)..................................................................................16

**Statutes**

15 U.S.C. § 1114..............................................................................................................16

15 U.S.C. § 1116(a)....................................................................................................16, 31

15 U.S.C. § 1125(a)..........................................................................................................16

**Rules**

Fed. R. Civ. P. 65.............................................................................................................36

Fed. R. Civ. P. 65(a)(2)......................................................................................................1

**Other Authorities**

*Abby Dupes & Leah Campano*, *Everything We Know About Hailey Bieber's
　Skincare Brand, Rhode*, Seventeen (June 15, 2022),
　https://tinyurl.com/mr2s8sf9 .........................................................................20

Darian Symoné Harvin & Zoey Grossman, *Hailey Bieber Knows You're Sick of
　Celebrity Beauty Brands*, Allure (May 2022), https://tinyurl.com/2kweecmp.......................20

George Driver, *Everything You Need To Know About Hailey Bieber's Skincare
　Line Rhode*, Elle (June 9, 2022), https://tinyurl.com/murwzcjn .............................................20

Hailey Bieber (@haileybieber0), Instagram,
　https://www.instagram.com/p/CejOBjAFF1D/ (last visited June 14, 2022) .........................20

J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1
　(5th ed. 2022).........................................................................................................17, 20

Lauren Rearick, *Hailey Bieber's Rhode Brand: Everything We Know So Far*,
　Teen Vogue (Apr. 8, 2022), https://tinyurl.com/2p92b6j9 ....................................................20

Plaintiff Rhode-NYC, LLC ("Rhode") respectfully submits this memorandum of law in support of its Order to Show Cause for a Preliminary Injunction pursuant to Fed. R. Civ. P. 65(a)(2), to enjoin Defendants Rhodedeodato Corp., HRBeauty, LLC d/b/a Rhode, and Hailey Bieber ("Defendants") from using "rhode" as a name, trade name, or trademark, as a domain name, on social media accounts, or in any other way that it is likely to cause confusion with Rhode and its own brand RHODE.

## INTRODUCTION

It's hard to build a brand from scratch, especially in the fashion industry. It was for Plaintiffs and co-founders Purna Khatau and Phoebe Vickers. When they conceived of Rhode in 2013, they had no name recognition, no connections, and no following. But the former college roommates did share a passion for travel and a nagging awareness of a gap in their wardrobes— and maybe a gap in the marketplace, too. So, they started a women's clothing company, launching a line of easy-but-sophisticated travel wear. They devoted themselves to building and promoting the RHODE brand, honing their aesthetic, expanding their product lines, and doggedly working to get the brand featured on fashion blogs and offered in stores. Nine years later, their RHODE-branded products have been featured in magazines like *Vogue*, carried in stores like Saks Fifth Avenue, and worn by celebrities and fashion influencers. Rhode is a quintessential modern success story—two women entrepreneurs, uniting diverse cultural backgrounds and shared taste to make products people love.

But now another quintessential modern story threatens Rhode's very existence. Defendant Hailey Bieber is mega-famous—like, 45-million-Instagram-followers famous. Now a wildly successful model and media personality, Bieber was getting started on the runway when Khatau and Vickers started shipping dresses from their apartments. And while Khatau and

Vickers spent nine years hustling to get their brand online and on shelves, Bieber's stardom grew, with ever more magazine covers, runway gigs, and photo sessions. She is now among the most recognizable young celebrities on the planet. She has decided to leverage that fame to market a line of beauty products, which she launched on June 15. And she insists on giving that brand her own middle name, which unfortunately happens to be Rhode.

Without the law's intervention, there is no suspense in how these colliding stories end: The RHODE brand Khatau and Vickers built gets swamped, washed under by a famous superstar who does not much care that the name she prefers for her beauty products is already being used by two other women entrepreneurs. Bieber's "rhode"-branded products will first saturate the beauty market that overlaps with the women's clothing and lifestyle market in which Rhode operates. Bieber has indicated that "rhode"-branded clothing is next, and her fans are already talking about it on social media. Bieber's immense name recognition, media presence, and following will overwhelm the goodwill and reputation Rhode's founders worked so hard to generate. And indeed, actual confusion is already rampant, as consumers encounter dueling Instagram handles and websites with "Rhode" in the name and wonder if Rhode's products are in fact Bieber's, or Rhode has itself launched a skincare line with an influencer. Far from dispelling confusion, Bieber appears intent on exacerbating it, adopting taglines like "shop rhode" and "on the rhode" that Rhode itself has been using for years.

Having tried and failed to appeal to Bieber and her various corporations to avoid this result, Rhode has no choice but to seek relief under the Lanham Act and New York common law to protect its federally-registered RHODE Marks and to request that the Court immediately enjoin Defendants' use of their confusingly similar "rhode" mark. Such relief is eminently justified. This is a textbook case of reverse confusion, in which a massive junior trademark user

threatens to trample a smaller senior user's mark.  The magnitude of Bieber's following and the

virality of her marketing will cause immediate, ongoing, and irreparable harm to Rhode's brand.

And the hardships and public interest weigh overwhelmingly in favor of protecting the nine-year

investment of two upstart entrepreneurs over the latest mega-venture by a mega-star.

Bieber has every right to leverage her own hard-earned fame to launch a beauty brand.

Rhode does not begrudge Bieber her success.  On the contrary, it celebrates the success of all

woman entrepreneurs.  But while Bieber clearly places enormous value on use of "rhode," she

could have picked another mark and built *that* brand without destroying someone else's hard

work.  Khatau and Vickers, on the other hand, started from scratch and did it the hard way.  The

RHODE Marks and the goodwill associated with them are the most important asset they have.

Trademark law exists to protect that interest.  The Court should grant the preliminary injunction.

## FACTUAL BACKGROUND

The facts relevant to this motion are fully set forth in the Verified Complaint, filed on

June 21, 2022, and the Declarations of Purna Khatau and Phoebe Vickers, dated June 21, 2022,

and are summarized herein.

### *Khatau and Vickers build the RHODE brand from scratch.*

In 2014, Khatau and Vickers launched Rhode to pursue their vision of forming a clothing

and lifestyle brand inspired by global culture, adventure, and carefree confidence.  Compl. ¶¶ 1,

26.  Khatau and Vickers had the idea for the company the previous year and built it from the

ground up.  Compl. ¶ 8; Khatau Decl. ¶¶ 4-8; Vickers Decl. ¶¶ 3, 11.  They scoured fabric

markets to find the perfect material for their clothes, working with a local tailor to bring their

designs to life.  Vickers Decl. ¶ 4.  To make shipments, Vickers would walk from her apartment

to the local FedEx several times a day.  Vickers Decl. ¶ 10.  And the label they chose, "Rhode,"

was a reflection of the company's DNA:  Inspired by the Greek mythological sea nymph who presided over the island Rhodes, the name captured the worldly and exuberant spirit Khatau and Vickers imbued in their products.  Compl. ¶ 27; *see* Vickers Decl. ¶ 3.

Product line by product line, store by store, blog by blog, Khatau and Vickers made their vision real.  Today, Rhode is known for its high-quality clothing, designed on timeless silhouettes in vivid colors and globally inspired prints.  Khatau Decl. ¶ 7; *see* Compl. ¶¶ 2, 26, 27.  Celebrities including Beyoncé, Rihanna, Mindy Kaling, Tracee Ellis Ross, and Lupita Nyong'o have worn and been photographed in Rhode clothing.

  

MINDY KALING                    TRACEE ELLIS-ROSS                    LUPITA NYONG'O

Compl. ¶ 30; Khatau Decl. ¶ 10.  Rhode's fashion and home products are sold at Bergdorf Goodman, Neiman Marcus, Saks Fifth Avenue, Bloomingdales, and other high-end stores are also featured on online luxury retailers.  Compl. ¶ 28; Khatau Decl. ¶ 8.  And the brand has enjoyed wide acclaim from the fashion industry, including recognition in *Vogue*, *Harper's Bazaar*, and dozens of similar publications worldwide.  Compl. ¶ 29; Khatau Decl. ¶ 11.

Rhode's financial growth is equally staggering.  Having sacrificed steady jobs to bet on themselves, Khatau and Vickers' first-year sales were less than $100,000.  Compl. ¶ 106; Khatau Decl. ¶ 15.  Rhode's projected sales for 2022 are $14.5 million—growth of over 14,500%, in an

intensely competitive industry and an economy that weathered the COVID pandemic.  Compl.

¶¶ 31, 106; Khatau Decl. ¶ 15.  Rhode's success has allowed it to expand into new product lines,

too, with even more expansion in the works.  As part of its initial vision to evolve into a lifestyle

brand, Rhode also has home goods under its RHODE Marks.  Rhode also has plans to expand

into footwear, accessories, men's clothing, jewelry, swimwear, and more.  Compl. ¶¶ 35-36;

Khatau Decl. ¶¶ 12, 20; Vickers Decl. ¶ 23.  And Rhode has also "considered expanding into

cosmetics and skincare," viewing it as a "natural and expected extension and a step we hoped to

take in the future."  Khatau Decl. ¶ 21.

To protect its investment and goodwill, Rhode has established and registered its

trademarks.  The "RHODE Marks" include three U.S. trademark registrations for RHODE—for

clothing (Reg. No. 5286239), handbags (Reg. No. 6267443), and textiles, children's and

women's clothing, hair accessories, dolls, puzzles, and holiday ornaments (Reg. No. 6539188).

In addition to these trademark rights, Rhode has established common law rights to the mark

RHODE and to its tagline, "on the rhode," in use since 2014.  All of the products underlying

Rhode's millions of dollars in sales bear its distinctive RHODE Marks, which have been in

continuous, uninterrupted use since the company's founding in 2013.  Compl. ¶¶ 33-41; Khatau

Decl. ¶ 19.

### *Defendants adopt the RHODE Marks despite Rhode's efforts at resolution.*

The internationally famous Bieber and her companies have apparently been considering

the launch of a product line for years.  And for several years, they have been fully aware of

Rhode's brand and the RHODE Marks.  In late 2018, they sought to purchase the RHODE

trademark for clothing for their own use.  Their counsel advised Rhode that he had just filed a

trademark application to register the mark "rhode" for class 25 goods, including clothing.

Compl. ¶¶ 46-48.  Recognizing that the application would not succeed given Rhode's registration, he asked if Ms. Bieber could purchase the mark.[1]  Compl. ¶ 48.  Khatau and Vickers refused.  They had built their growing brand out of their apartments, and the RHODE Marks were their most significant asset.  Compl. ¶ 49.  When Rhode refused to sell and its trademark registration was cited against Defendants, Defendants abandoned their application.  Compl. ¶ 50.

But Bieber and her companies were undeterred.  In 2019 and 2020, they tried again, filing a variety of intent-to-use trademark applications, including HAILEY RHODE for clothing and RHODE for beauty and cosmetics.  Compl. ¶¶ 51-52.  Although no product release appeared imminent, Rhode was concerned, and thus contacted Defendants' counsel to explain the likely confusion that would result from Defendants' apparent plans.  Compl. ¶ 53; Khatau Decl. ¶ 26 & Ex. 14.  Defendants' counsel stridently disclaimed any confusion, making it clear that Defendants would bully forward no matter what.  Compl. ¶ 54; Khatau Decl. ¶ 26 & Ex. 15.  But Defendants did, consistent with their prior abandonment of their application for use of "rhode" with clothing, assure Rhode that they would not sell "rhode"-branded clothes.  Compl. ¶ 54; Khatau Decl. ¶ 27.

In the midst of the uncertainty caused by the COVID pandemic, and unsure whether Defendants would ever actually bring any product line to market, Rhode decided not to incur further legal fees fighting a corporate behemoth.  Khatau Decl. ¶ 27.  Rhode informed Defendants that it reserved the right to contest any future use of RHODE if it caused confusion with Rhode's brand, indicating that it would continue to monitor the situation.  Khatau Decl. ¶ 27.

---

[1] For ease of reference, this memorandum calls Rhode's mark "RHODE" and Defendants' infringing mark "rhode."  Both marks, however, would be registered identically as "RHODE."

Recently, however, Rhode learned that Defendants had a launch planned for June 2022. Khatau Decl. ¶ 28.  Not only that, Rhode also learned that Defendants had filed an application to register a "rhode" mark in International Class 25 for use on clothing and a wide-ranging variety of other goods and services, from photographic instruments and computers, to bags, leather goods, and luggage, to advertising and promotional uses.  Compl. ¶ 55.

Upon learning of Defendants' intended launch, Rhode again reached out to Defendants' counsel in the hope of having a discussion to avoid the inevitable confusion from Defendants' use of "rhode."  Khatau Decl. ¶ 30.  Rhode explained that, in light of Bieber's celebrity, the risk that Rhode's brand would be subsumed and damaged was enormous.  Khatau Decl. ¶ 30 & Ex. 18.  Defendants' counsel dismissed Rhode's concerns.  Khatau Decl. ¶ 30 & Ex. 19.  Defendants would do whatever they felt like doing.

### *Defendants launch their brand under the RHODE Marks.*

On June 15, 2022, Defendants launched a celebrity beauty product line of skin care products branded "rhode."  Compl. ¶ 42.  Defendants also use that mark on apparel for promotional purposes.  Compl. ¶ 90.  Bieber, a well-known model and social media icon, is the face of Defendants' brand.  Compl. ¶ 58.  Over 45 million Instagram users follow her account. Compl. ¶ 58.  And both leading up to and after the launch, she used every bit of her vast reach to inundate the market with her own "rhode"-branded products.



Compl. ¶¶ 60-61, 90; Khatau Decl. ¶¶ 34-35.  These posts have received enormous attention.

The first, which Bieber captioned "@rhode is getting closer by the day," received over 1.1

million "likes."  Compl. ¶ 60.  The second, a collaboration between Bieber's account and the

@rhode Instagram account, received more than 600,000 likes.  Compl. ¶ 61.  The third image,

which shows Bieber wearing RHODE-marked clothing, has been re-posted many times:



Compl. ¶ 90.  Defendants have also promoted the mark on their website, rhodeskin.com.  Compl.

¶ 62; Khatau Decl. ¶ 36 & Ex. 22.  And Bieber's husband, the pop star Justin Bieber, has also

promoted the "rhode" skincare line on his social media accounts.  Compl. ¶ 63; Khatau Decl.

¶ 37.  His post reached his 243 million Instagram followers and garnered 1.5 million likes.

Compl. ¶ 63; Khatau Decl. ¶ 37.

***Consumer confusion has been immediate and widespread.***

Consumer confusion started even before the product launch.  Khatau Decl. ¶ 38.  That confusion was rampant online, where Instagram users, both prominent and private, mixed up the brands.  For instance, an Instagram account with over 2 million followers that identifies clothing worn by celebrities tagged Defendants' @rhode handle—rather than Rhode's @shoprhode handle—in a photo of actress Hilary Duff wearing a Rhode dress sold by Plaintiff:



Compl. ¶ 77.  As a result, when a user looking for that Rhode dress—like @mimichou22 above—clicks the tag on the image, they will be taken to Defendants' site rather than Rhode's.  Compl. ¶¶ 77, 80.  Such misdirection is certain to result in lost sales to Rhode.  Khatau Decl. ¶¶ 39-43; Vickers Decl. ¶ 17.  Instances of such mis-tagging have already been prevalent.  Compl. ¶ 79 (capturing half a dozen screen shots of additional examples).

Defendants also market their products to the same consumers who know and buy Rhode's goods.  Their email promotions, for instance, create a risk of confusion.  On June 14, 2022, both brands emailed their respective mailing lists within the same 30-minute span:



Compl. ¶ 74; Vickers Decl. ¶ 18.

Defendants' marketing blitz has showed an utter lack of regard for Rhode.  Defendants led an Instagram Live event titled "shop rhode with hailey"—mimicking exactly Rhode's @shoprhode handle and website url.  Compl. ¶ 81; Khatau Decl. ¶ 51; Vickers Decl. ¶ 25. Defendants have also used the "on the rhode" tag line on their website and in customer emails, even though Rhode has used the hash tag #ontherhode since its inception.  Compl. ¶¶ 82-84; Khatau Decl. ¶¶ 52, 56 & Ex. 37; Vickers Decl. ¶¶ 6-8, 26 & Exs. 3-5.  Photographs of Bieber promoting her skincare line have also made the rounds, prompting consumers to ask Rhode whether it sells Bieber's clothing:



Compl. ¶ 85; Vickers Decl. ¶ 27.  Consumers are broadly continuing to confuse the brands

online, assuming Rhode sells Bieber's clothing or that Bieber will sell clothing herself.  Compl.

¶ 85; Khatau Decl. ¶ 57.  Rather than clarify the confusion, Bieber has posted images in

RHODE-marked clothing and promised fans that Defendants will expand into Rhode's core

market: "Clothes will come:)".  Compl. ¶¶ 90, 92-94; Khatau Decl. ¶ 50; Vickers Decl. ¶ 24.



Rhode's own partners have been confused, too; stores that have carried Rhode's wares assumed it had some involvement with Defendants' line, expressing frustration for being left out of the loop.  One store owner wrote to a Rhode sales agent:  "I saw that Rhode is coming out with a skincare line and hailey Bieber is the spokesperson…?  Is it going to be [direct-to-consumer] or are we going to be able to buy it and sell it as well?  Nobody mentioned it to me in the showroom and it's all over social media, I wish someone would've let me know."  Compl. ¶ 86.

Multiple people, including potential customers, have already reached out to Rhode's founders to question their relationship with Defendants' line and express their confusion. Compl. ¶¶ 85-59; Khatau Decl. ¶¶ 44, 53-55, 57; Vickers Decl. ¶¶ 19, 28.   In fact, Rhode has begun receiving customer service emails from Defendants' customers with questions about Defendants' goods.  Khatau Decl. ¶ 56.

### *Rhode is suffering ongoing harm from Defendants' use of its mark.*

The consequences of Defendants' infringement have materialized in the days leading up to and since Defendants' launch.  *See generally* Compl. ¶¶ 95-107.  With a celebrity as high

profile as Bieber as the face of the brand, Defendants have been able to inundate the market with their own "rhode" name.  Even before Defendants launched, social media platforms like Instagram—which are critical to marketing and sales—gave them priority, granting Bieber the verified @rhode handle.  Compl. ¶ 65; Khatau Decl. ¶ 33.  The algorithms will inevitably side with Bieber, too.  The day before Defendant's launch, Rhode was the first Google result for a "rhode" search:



The day after, Rhode was buried by Bieber:



Compl. ¶ 73.

Khatau and Vickers are not celebrities.  But they are savvy businesspeople who are keenly aware of what Defendants' conduct means for their brand.  *See* Khatau Decl. ¶¶ 59-62; Vickers Decl. ¶¶ 29-31.  Some consumers will think their products are Bieber's.  Some consumers will think Bieber's products are theirs.  Some will think they are all collaborating. Some will think Rhode is an infringer.  Some will hear of Rhode, but be unable to find its products on an internet that favors celebrity over all else.  Retail stores and potential collaborators concerned about confusing their own consumers or angering Defendants will see

little choice but to side with the bigger brand, too.  And Rhode's own plans to expand will be

scuttled by an inability to leverage their mark in markets saturated with Bieber.  As Khatau

explains, without the celebrity firepower to fight back, Defendants will "essentially kill our

brand."  Khatau Decl. ¶ 59.  In light of Defendants' continued infringement and the threat it

poses to Rhode, Rhode has been forced to bring suit and seek this preliminary injunction.

**ARGUMENT**

To obtain a preliminary injunction, the movant must establish "'(1) the likelihood of

irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on

the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for

litigation plus a balance of hardships tipping decidedly toward the party requesting the

preliminary relief.'"  *Zino Davidoff SA v. CVS Corp.*, 571 F.3d 238, 242 (2d Cir. 2009).  Because

a plaintiff "shall be entitled to a rebuttable presumption of irreparable harm … upon a finding of

likelihood of success on the merits for a [trademark law] violation," 15 U.S.C. § 1116(a), we turn

first to the merits.

**I.   RHODE IS LIKELY TO SUCCEED ON THE MERITS**.

Rhode asserts trademark infringement claims under §§ 32 and 43(a) of the Lanham Act,

15 U.S.C. §§ 1114, 1125(a), and New York common law.  The elements for these causes of

action are the same:  A plaintiff must show (a) that it owns a mark entitled to trademark

protection; and (b) that the "defendant's use of the mark is likely to cause consumers confusion

as to the origin or sponsorship of the defendant's goods."  *Virgin Enters. Ltd. v. Nawab*, 335 F.3d

141, 146 (2d Cir. 2003) (Lanham Act elements); *Van Praagh v. Gratton*, 993 F. Supp. 2d 293,

302 (E.D.N.Y. 2014) (elements of common law claims "mirror the Lanham Act claims").

Rhode easily satisfies each element.  Indeed, it is hard to imagine a clearer case of

16

"reverse confusion," in which a powerful junior trademark user's use so dwarfs the senior user's that consumers are likely to be left with "the misimpression that the junior user is the source of the senior user's goods." *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 490 (2d Cir. 1988) (citing J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 23:1 (5th ed. 2022)).  Simply put, Bieber is so famous that her use of "rhode" will inevitably swamp Rhode's use of its own mark, threatening "'product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.'" *Ironhawk Techs., Inc. v. Dropbox, Inc.*, 2 F.4th 1150, 1160 (9th Cir. 2021) (quoting *Ameritech, Inc. v. Am. Info. Techs. Corp.*, 811 F.2d 960, 964 (6th Cir. 1987)).  And the independent strength of Rhode's mark also creates the likelihood of *forward* confusion, as those who know the RHODE brand may mistakenly believe that Bieber's "rhode"-branded products are sold or endorsed by Rhode. *Thoip v. Walt Disney Co.*, 736 F. Supp. 2d 689, 694 (S.D.N.Y. 2010) (nothing that reverse and forward confusion are "not mutually exclusive").  These two independent sources of confusion both make success on the merits likely.

### A.   Rhode Owns Protectable Marks.

The RHODE Marks are protectable.  Rhode has used RHODE to identify its clothing line since 2014.  Over the years, its use of RHODE has expanded such that it now owns three U.S. trademark registrations for use of the word mark RHODE on clothing (Reg. No. 5286239), handbags (Reg. No. 6267443), and textiles, children's and women's clothing, hair accessories, dolls, puzzles, and holiday ornaments (Reg. No. 6539188).  Because a trademark registration "entitles the owner to a presumption that [the] mark is valid," *Wal-Mart Stores, Inc. v. Samara Bros.*, 529 U.S. 205, 209 (2000), Rhode's registrations constitute prima facie evidence that RHODE is entitled to protection.

In addition, as explained in greater detail below (at 18-20), RHODE is an inherently distinctive mark because it is "arbitrary"—that is, it "neither describe[s] nor suggest[s] anything about the product." *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221 (3d Cir. 2000). Such marks are entitled to strong trademark protection because they have the capacity to designate the user as the origin of goods. *See BigStar Ent., Inc. v. Next Big Star, Inc.*, 105 F. Supp. 2d 185, 198 (S.D.N.Y. 2000). Rhode has also used the hashtag "#ontheRhode" since 2014, which is also an arbitrary mark when used in connection with the goods Rhode sells, entitling that unregistered mark, too, to common law protection.

### B.   Defendants' Use Of The Mark Is Highly Likely To Cause Confusion.

To evaluate the likelihood of confusion, courts use the familiar eight-factor test set out in *Polaroid Corp. v. Polarad Elecs. Corp.*:

> [1] the strength of [the] mark, [2] the degree of similarity between the two marks, [3] the proximity of the products, [4] the likelihood that the prior owner will bridge the gap, [5] actual confusion, … [6] defendant's good faith in adopting its own mark, [7] the quality of defendant's product, and [8] the sophistication of buyers.

287 F.2d 492, 495 (2d Cir. 1961); *see Banff*, 841 F.2d at 489-93 (applying *Polaroid* in reverse confusion case). "No single factor is dispositive." *Brennan's, Inc. v. Brennan's Rest., L.L.C.*, 360 F.3d 125, 130 (2d Cir. 2004). Courts consider the mix of factors to answer the "'ultimate question of whether consumers are likely to be confused.'" *Nabisco, Inc. v. Warner-Lambert Co.*, 220 F.3d 43, 46 (2d Cir. 2000).

***The RHODE Marks are conceptually and commercially strong, but cannot match Defendants' commercial strength.*** The strength of a mark refers to its capacity to act as a designation of the source of a good or service. The strength of a mark "depends ultimately on its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public." *Savin*

*Corp. v. Savin Grp.*, 391 F.3d 439, 457 (2d Cir. 2004).  In evaluating distinctiveness, courts consider both the mark's inherent distinctiveness—*i.e.*, its conceptual strength—and its distinctiveness in the marketplace—*i.e.*, its commercial strength.  *Hope Organics LLC v. Preggo Leggings LLC*, No. 21-CV-2416, 2021 WL 5919367, *3 (S.D.N.Y. Dec. 15, 2021).

RHODE is inherently distinctive as used with women's clothing, handbags, and home goods.  Trademarks are divided into four classes with respect to protection, "[a]rrayed in an ascending order which roughly reflects their eligibility to trademark status and the degree of protection accorded": "(1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful." *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976) (Friendly, J.). Rhode's use of RHODE is a quintessentially "[a]rbitrary or fanciful" mark, as it "neither describe[s] nor suggest[s] anything about the product." *A & H Sportswear*, 237 F.3d at 221.  In both the forward confusion and reverse confusion contexts, significant conceptual strength makes confusion likely.  *Id.*; *see also H. Lubovsky, Inc. v. Espirit de Corp.*, 627 F. Supp. 483 (S.D.N.Y. 1986) (same).[2]

RHODE has also acquired commercial strength—the hard way.  Khatau and Vickers had no celebrity capital or cadre of corporate ventures on which to build their brand.  But they developed a unique aesthetic and market position, growing the company's sales many times over.  They achieved such astounding success—in a hyper-competitive industry, and through a global pandemic—by consistently delivering high-quality, recognizable products to a loyal and

---

[2] Notably, Defendants' use of "rhode" has less inherent source-identifying capacity because it is Hailey Bieber's middle name, which thus makes the mark "descriptive."  *See Yarmuth-Dion, Inc. v. D'ion Furs, Inc.*, 835 F.2d 990, 993 (2d Cir. 1987) ("[A] personal name[] is a descriptive mark.") (collecting cases).  Defendants thus seek to use their comparatively enormous *commercial* power to inundate the market with a "rhode" that threatens to displace a trademark that is entitled to greater solicitude under the trademark law.

expanding customer base that seeks its products out in store and online. *See supra* 3-5. Rhode's commercial strength weighs firmly in favor of a finding of forward confusion.

But it is Defendants' comparatively huge commercial platform that makes *reverse* confusion so certain. Bieber has promoted her "rhode"-branded products to over 45 million followers on her Instagram account, and her husband Justin has posted to his 243 million followers. *See supra* 7-9. The launch has also featured an Instagram account for rhode (@rhode) that amassed 247,000 followers before it launched, Compl. ¶ 59, Instagram posts with more than 1,000,000 likes,[3] favorable press coverage in *Elle*, *Seventeen*, and *Teen Vogue*,[4] and a full-length cover story in *Allure*.[5] By comparison, Rhode's Instagram account (@shoprhode) currently has 190,000 followers, and the brand has not yet attracted a comparable level of press attention. The "hallmark of a reverse confusion case" is "the relatively large advertising and promotion of the *junior* user." *A & H Sportswear*, 237 F.3d at 230 (quoting J. Thomas McCarthy, *supra*, § 23:10). Here, Defendants' "aggressive advertising efforts" and "ability to 'saturate' the market with their mark," *Thoip*, 788 F. Supp. 2d at 188, mean that Defendants are "apt to drown out the moderate success of" Rhode, leading to both reverse and forward confusion, *Thoip*, 736 F. Supp. 2d at 694.

   ***The marks are identical.*** In considering the similarity of the marks, "courts must assess

---

[3] *See* Hailey Bieber (@haileybieber), Instagram, https://www.instagram.com/p/CejOBjAFF1D/ (last visited June 14, 2022).

[4] George Driver, *Everything You Need To Know About Hailey Bieber's Skincare Line Rhode*, Elle (June 9, 2022), https://tinyurl.com/murwzcjn; *Abby Dupes & Leah Campano*, *Everything We Know About Hailey Bieber's Skincare Brand, Rhode*, Seventeen (June 15, 2022), https://tinyurl.com/mr2s8sf9; Lauren Rearick, *Hailey Bieber's Rhode Brand: Everything We Know So Far*, Teen Vogue (Apr. 8, 2022), https://tinyurl.com/2p92b6j9.

[5] Darian Symoné Harvin & Zoey Grossman, *Hailey Bieber Knows You're Sick of Celebrity Beauty Brands*, Allure (May 2022), https://tinyurl.com/2kweecmp.

whether the 'overall impression' created by the marks at issue in relation to the 'context in which they are found' is likely to confuse prospective customers." *Thoip*, 736 F. Supp. 2d at 710 (quoting *Malletier v. Dooney & Bourke, Inc.*, 561 F. Supp. 2d 368, 384 (S.D.N.Y. 2008)).  This is a "holistic consideration that turns on the marks' sight, sound, and overall commercial impression." *Akiro LLC v. House of Cheatham, Inc.*, 946 F. Supp. 2d 324, 334 (S.D.N.Y. 2013).

Here the marks are textually and aurally identical. *Two Hands IP LLC v. Two Hands Am., Inc.*, 563 F. Supp. 3d 290, 304-05 (S.D.N.Y. 2021) (alterations omitted) (finding likelihood of consumer confusion "when the dominant words in two marks are the same"); *Akiro*, 946 F. Supp. 2d at 334 (finding likelihood of confusion for two marks that "sound similar").  Moreover, the two marks—indisputably identical when rendered in "standard typestyle"—retain certain "striking ... visual similarities" even when they are rendered in their typical typefaces. *Banff*, 841 F.2d at 492.  Both marks are rendered in a sans-serif typeface, which "exacerbates the like impression created by the two labels." *Id.*

The only notable visual difference between the two marks is that Rhode tends to use all capitals ("RHODE"), whereas Defendants tend to use all lower case ("rhode").  But whatever distinction that might suggest to someone closely evaluating the marks side-by-side, "'the correct test is whether a consumer who is somewhat familiar with the plaintiff's mark would likely be confused when presented with defendant's mark alone.'" *Akiro*, 946 F. Supp. 2d at 334.  Such a consumer would.  And in any event, third-party media, social media participants, and search engines cannot be expected to consistently follow capitalization conventions like these. *Cf. supra* 10.

***The products are in closely related markets.***  The third factor "concerns whether and to what extent the two products compete with each other" and "the nature of the products

themselves and the structure of the relevant market." *Morningside Grp. Ltd. v. Morningside Cap. Grp.*, 182 F.3d 133, 140 (2d Cir. 1999) (quoting *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 480 (2d Cir. 1996)).  "[T]he closer the secondary user's goods are to those the consumer has seen marketed under the prior user's brand, the more likely that the consumer will mistakenly assume a common source." *Virgin Enters.*, 335 F.3d at 150.  The two product markets do not have to be identical, or even similar—the question is simply "whether [a] consumer might ... reasonably conclude that one company would offer both of [the] products." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 481 (3d Cir. 1994) (finding trademark infringement despite lack of direct competition between the parties).

Here, although the parties' products are not yet in direct competition, they operate in "related" markets, which weighs in favor of likelihood of confusion.  Two markets are "related" if "customers are likely to think that the infringer's goods come from the same source as the senior user's goods" or, at minimum, are "affiliated with or connected with the senior user." *N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc.*, 704 F. Supp. 2d 305, 336 (S.D.N.Y. 2010). The market for beauty products (like cosmetics) and the market for fashion items (like clothing, bags, and shoes) are "closely related," such that reasonable consumers could conclude—and have concluded—that RHODE clothing and "rhode" beauty products shared the same origin. *See supra* 10, 12.  Indeed, email promotions for Rhode's and Defendants' products have already been targeted at the same consumers. *See supra* 11 (screenshot of promotional emails from RHODE and "rhode" arriving within same hour).

Cross-over is common and expected between the market for beauty products and the market for fashion products—especially when it comes to celebrity brands. *See, e.g.*, *Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1174-75 (2d Cir. 1976) (holding that clothing

and cosmetics were "by their nature ... closely related" markets).  In general, brands like Chanel, Dior, and Tom Ford have expanded across clothing, footwear, beauty, fragrance, skincare, and lifestyle goods, as have celebrity brands by Gwyneth Paltrow, Kim Kardashian, Kylie Jenner, and Rihanna.  Compl. ¶ 102.  And for brands like Rhode, Khatau explains, cross-over often happens in the form of collaborations with cosmetics brands—for example, between cosmetics brand Aveda and fashion brand 3.1 Phillip Lim, or between Sephora and Mara Hoffman.  Khatau Decl. ¶ 22.

Rhode's fashion products and Defendants' skincare products are also likely to be promoted and sold through similar—if not identical—sales channels.  *See Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 491 (S.D.N.Y. 2004) (comparing the products' "target clientele" and "typical distribution channels").  Both types of products rely heavily on online marketing and sales, where similar demographics will shop for clothing, accessories, and skincare products alike.  And Rhode also sells its products through various websites and brick-and-mortar retailers, like department stores, that sell both clothing and skincare products.  This factor too favors finding a likelihood of confusion.

***Rhode is likely to bridge the gap—and so are Defendants.***  Likelihood of "bridging the gap"—a closely related factor—examines "whether the senior user of the mark is likely to enter the market in which the junior user is operating."  *Tri–Star Pictures, Inc. v. Unger*, 14 F. Supp. 2d 339, 356 (S.D.N.Y. 1998) (internal quotation marks omitted).  To begin with, as the Second Circuit explained in *Scarves by Vera*, the fashion and beauty marks are "so closely related" to the market for apparel that any gap is vanishingly small, and there is thus "no need to decide whether there [was] a substantial likelihood that plaintiff [would] enter the cosmetics ... market."  544 F.2d at 1174.  Confusion exists without cross-over.

In any event, Rhode is likely to bridge the gap.  As Khatau explains, Rhode's "collaborators [have] asked us specifically if we could add some cosmetics products," and "it is a natural and expected extension and a step we hoped to take in the future."  Khatau Decl. ¶ 21. This is hardly fanciful.  Rhode has already expanded from women's clothing to handbags and home goods.  Rhode also has pending trademark applications for use of RHODE with products that are in development, including footwear, men's clothing, sunglasses, jewelry, and housewares.  *Supra* 5.  Rhode has not stood still since its inception, and it has no plans of doing so now.

Meanwhile, Defendants have given every indication that they plan to expand beyond the narrow category of beauty products.  Defendants sought registration in a variety of other goods (described above at 7), including everything from bags, cash registers, diving gear, pocket wallets, shop window dressing, and search engine optimization.  Even after assuring Rhode they would not sell clothing in particular under the RHODE brand and withdrawing their application for clothing when Rhode's marks were cited against them, they recently have filed a new trademark application seeking registration in International Class 25 for clothing.  Compl. ¶ 55. And Defendants have already affixed the infringing "rhode" mark to clothing in photos online. Although they claim those items are promotional and that they are not selling clothing under the mark, the consumers seeing those clothing items certainly do not know that.  To the contrary, Bieber's fans assume that she will, and even already does, sell clothing.  *Supra* 9.

Perhaps most shocking, Rhode has located a TikTok comment where Bieber herself expressly promises fans that her empire will reach clothes:  In response to a user video proposing Bieber should sell clothing under the label "rhode," Bieber commented "Clothes will come :)". *Supra* 12-13.  Bieber's horizons are set even further:  She has already spoken about turning her

"rhode" brand into a lifestyle brand, just as Rhode has been doing for the better part of a decade. *See* Vickers Decl. ¶ 23.

It is well recognized that a principal harm in reverse confusion cases is the hindrance of a senior user's "'ability to move into new markets.'" *Ironhawk Techs.*, 2 F.4th at 1160. That harm is highly like to materialize here.

***Consumers are already confused.***  "[E]vidence of actual confusion, where shown, is highly probative of the likelihood of confusion." *Sunenblick v. Harrell*, 895 F. Supp. 616, 630 (S.D.N.Y. 1995). "Proof of actual confusion may take the form of direct evidence, such as anecdotal evidence by consumers." *Id.*  Here, such direct evidence exists. *See generally supra* 10-13. On Instagram, Rhode's clothing has regularly been tagged with Defendants' Instagram handle (@rhode) rather than Rhode's Instagram handle (@shoprhode). For instance, when an Instagram user asked Fashion Bomb Daily—an Instagram account with 2 million followers—to "find [the] dress" actress Hilary Duff was wearing in a promotional photo, the account tagged Defendants even though the dress was made by Rhode. To make matters worse, any Instagram user who clicked that tag in search of Rhode's dress was taken to Defendants' page. *Supra* 10. That misattribution and direction is happening all over the web:



Compl. ¶ 79.   Rhode's founders have already been asked whether they have any relationship to

Defendants' "rhode" beauty line, by everyone from friends to sales reps to consumers

themselves.  *E.g.*, Compl. ¶ 87 (comment asking Rhode, "Where do I find your new skincare []

line[]?"); Compl. ¶ 86 (message from buyer saying "I saw that Rhode is coming out with a

skincare line and hailey Bieber is going to be the spokesperson…?"); Compl. ¶ 87 (customer service inquiry about Defendants' product sent to Rhode).

"[T]here can be no more positive proof of likelihood of confusion" than such instances of actual confusion.  *Sunenblick*, 895 F. Supp. at 630; *see also Morningside Grp. Ltd.*, 182 F.3d at 143 ("[If consumers] have already been *actually* confused, it cannot be gainsaid that others in the same market are *likely* to be confused.").  Accordingly, this factor strongly favors finding a likelihood of confusion.

   ***Defendants adopted the RHODE Marks in knowing disregard of Rhode's rights.***  In a reverse confusion case, a plaintiff need not show that the junior user specifically intended to capitalize on plaintiff's good will, because "typically . . . neither junior nor senior user wishes to siphon off the other's goodwill."  *Marketquest Grp., Inc. v. BIC Corp.*, 862 F.3d 927, 934 (9th Cir. 2017).  Rather, the question under this factor is whether the defendant somehow "culpably disregarded the risk of reverse confusion."  *Id.* at 934-35.  Such intent can be shown in many ways—"by evidence that, for example, the defendant knew of the mark, should have known of the mark, intended to copy the plaintiff, failed to conduct a reasonably adequate trademark search, or otherwise culpably disregarded the risk of reverse confusion."  *Id.*  Ordinarily, "[t]he inquiry into a defendant's intent is resolved by determining whether the alleged infringer has selected a similar or identical mark with *knowledge* of the senior user's mark."  *Sunenblick*, 895 F. Supp. at 632 (emphasis added).

   Here, it is indisputable that Defendants had actual knowledge of Rhode's identical mark—in 2018, clearly knowing that they had an issue with possible confusion, they contacted Rhode seeking to purchase the rights to RHODE trademarks owned by Rhode.  Defendants even abandoned their application to use RHODE for a line of clothing.  When Defendants later filed

new applications, Rhode's counsel wrote them with concerns about likelihood of confusion and asked that they cease all use of the "rhode" mark, adding that Rhode would seek redress if Defendants went ahead to use "rhode" in a way likely to cause confusion with RHODE.  *Supra* 6.

While it is certainly understandable that Defendants wish to use Hailey Bieber's middle name to brand her products, modern trademark decisions have expressly repudiated the notion that one has a "sacred right" to use one's own name as a mark.  *Scarves by Vera*, 544 F.2d at 1173 ("[E]ven when the mark in question is the name of the junior user, his right to use the name on his products may be limited….").  The fact is that Defendants knew that Rhode was already using RHODE and had been for some time, which means that when Defendants adopted RHODE for skincare, they "disregarded the risk of reverse confusion."  *Marketquest Grp., Inc.*, 862 F.3d at 935.  Accordingly, Defendants' decision to knowingly appropriate an identical mark in disregard of Rhode's rights strongly supports a finding of likelihood of confusion.

As for forward confusion, there is reason to believe that Defendants have and are continuing to wield their mark with the intent to confuse the public.  In her Instagram live stream launching the brand, Bieber used the slogan "shop rhode," which is both Rhode's Instagram handle and its website.  *See supra* 11.  And Defendants' website, rhodeskin.com, invites users to join them "on the rhode," which has been Rhode's Instagram hashtag since its inception in 2014. *See supra* 11.  This evidence of intent to deceive weighs in favor of a finding of likelihood of forward confusion.

***Rhode's and Defendants' products differ in quality and aesthetics.***  "This factor is primarily concerned with whether the senior user's reputation could be jeopardized" by differences in the nature or quality of the parties' products.  *Arrow Fastener Co. v. Stanley*

*Works,* 59 F.3d 384, 398 (2d Cir. 1995).  The underlying concern is one of harm to the senior

mark's goodwill.  *See, e.g.*, *Virgin Enters.,* 335 F.3d at 152.

Although Rhode has no reason to question the quality of Defendants' products,

Defendants' marketing and design strategy is "inconsistent with the image [Rhode] wishes to

project."  *Pfizer Inc. v. Sachs*, 652 F. Supp. 2d 512, 523-24 (S.D.N.Y. 2009); *see also Dallas*

*Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 205 (2d Cir. 1979) ("The

trademark laws are designed not only to prevent consumer confusion but also to protect 'the

synonymous right of a trademark owner to control his product's reputation.'").  Here, Rhode has

carefully cultivated a high-end brand with a honed aesthetic.  Rhode is available in department

stores like Saks Fifth Avenue, Nieman Marcus, and Bergdorf Goodman, and it is regularly worn

by celebrities like Beyoncé, Rihanna, Lupita N'yongo, and Debra Messing.  If Defendants are

permitted to saturate the market with their brand through Bieber's immense online following,

this would undermine Rhode's established reputation and curated aesthetic.  This factor therefore

weighs in favor of finding a likelihood of confusion.

> ***Online consumers are unlikely to be discerning with respect to the products in***
>
> ***question.***  The final factor assesses the level of sophistication of consumers in the relevant

market.  "The more sophisticated the purchaser, the less likely he or she will be confused by the

presence of similar marks in the marketplace."  *Savin,* 391 F.3d at 461.

The internet context broadly weighs in favor of finding a likelihood of confusion.

Because internet browsing "takes little effort" and allows for less ability to discern precisely

what one is purchasing, online shoppers "are more likely to be confused as to the ownership of a

web site than traditional patrons of a brick-and-mortar store would be of a store's ownership."

*GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1209 (9th Cir. 2000); *see also On-Line*

*Careline, Inc. v. Am. Online, Inc.*, 229 F. 3d 1080, 1087 (Fed. Cir. 2000) ("[T]here is no basis for concluding that Internet users are any more knowledgeable or sophisticated than the general public.").

Even sophisticated consumers, moreover, may be confused when two parties' marks and services are identical. *See Morningside Grp. Ltd.*, 182 F.3d at 143 ("It is clear in all events that when, as here, there is a high degree of similarity between the parties' services and marks, the sophistication of the buyers cannot be relied on to prevent confusion." (internal quotation marks omitted)).  In this case, the marks are textually identical.  And when it comes to "identical" marks, "'even a highly sophisticated and discriminating class of consumers cannot be relied upon to allay confusion.'" *Pfizer*, 652 F. Supp. 2d at 524.

***

In sum, all eight of the *Polaroid* factors weigh in favor of finding a likelihood of confusion.  As a result, Rhode is likely to succeed on the merits of its claim under both sections 32 and 43(a) of the Lanham Act and New York common law.[6]

## II.    RHODE IS FACING DEEPENING AND IRREPARABLE HARM.

"Irreparable harm 'exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial,' because loss of control over one's reputation is neither 'calculable nor precisely compensable.'" *New York City Triathlon*, 704 F. Supp. 2d at 343 (quoting *Power Test Petroleum Distribs., Inc. v. Calcu Gas,*

---

[6] Although "the standards for Section 43(a) claims of the Lanham Act and unfair competition claims under New York Law are almost indistinguishable," *Tri–Star Pictures*, 14 F. Supp. 2d at 363, some courts have suggested that common law unfair competition claims "may require an additional element of bad faith or intent." *Girl Scouts v. Bantam Doubleday Dell Publ'g Grp., Inc.*, 808 F. Supp. 1112, 1131 (S.D.N.Y.1992).  To the extent such a showing is required, Defendants' conduct establishes this element for reasons discussed above (at 27-28).

*Inc.*, 754 F.2d 91, 95 (2d Cir. 1985)).  In fact, the "[p]rospective loss of ... goodwill alone is sufficient to support a finding of irreparable harm."  *Id.*

As discussed above, where the movant has established a likelihood of consumer confusion or deception, the movant is entitled to a "presumption of irreparable harm," 15 U.S.C. § 1116(a).  That presumption directly applies here because Rhode has shown that Defendants' "use of its mark creates a likelihood of consumer confusion, which leads to the presumption of irreparable harm."  *Museum of Mod. Art v. MOMACHA IP LLC*, 339 F. Supp. 3d 361, 382 (S.D.N.Y. 2018); *City of New York v. Lopez*, No. 21 CV 7862, 2021 WL 6063839, at *4-5 (S.D.N.Y. Dec. 21, 2021), *appeal filed*, No. 22-160 (2d Cir. 2022*)*; *Hope Organics*, 2021 WL 5919367, at *11-12.  Typically, the presumption of irreparable harm can be overcome only where a plaintiff's lengthy delay suggests a lack of genuine urgency.  Here, Rhode diligently alerted Defendants to the confusion it feared would occur if Bieber was able to launch a "rhode"-branded line.  And although it is a relatively small brand that must be exceedingly judicious in incurring significant litigation costs, Rhode has brought suit immediately after Defendants' product launch, at which point it became clear that this confusion was a virtual certainty.

Moreover, independent of the presumption, the irreparable harm that Rhode is currently facing is both palpable and immediate.  As Khatau and Vickers explain at length, consumers will be confused every which way by Defendants' "rhode"-branded products, destroying the goodwill they have worked to build.  Already, Rhode's goods have been misattributed to Defendants' "rhode" online, and Rhode's customers are inquiring about the two brands' connections.  Khatau Decl. ¶¶ 39-44, 55-57.  Some consumers are likely to think that Defendants' products were made by Rhode, and others will think that Rhode's products are made by Defendants, Khatau Decl. ¶ 59.  Consumers who encounter Defendants' use of "rhode" first may think that Rhode is the

infringer.  Khatau Decl. ¶ 59.  And many will think that Rhode, a long-established brand, is merely an offshoot or affiliate of Bieber's celebrity-product empire.  Control over the mark Rhode spent nine years building "would be out of its hands."  *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 541 (S.D.N.Y. 2011), *aff'd*, 511 F. App'x 81 (2d Cir. 2013); *accord Church of Scientology Int'l v. Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir. 1986) ("[I]rreparable harm exists in a trademark case when the party seeking the injunction shows that it will lose control over the reputation of its trademark pending trial." (quotation marks omitted)).

Meanwhile, Defendants' market saturation threatens Rhode's expansion.  As Khatau explains, large stores or websites may favor Defendants over Rhode.  Khatau Decl. ¶¶ 60-61.  Defendants' use also threatens to block Rhode's expansion into new product markets, especially as Defendants grow their company into a lifestyle brand—just as Rhode has been planning to do for years.  Khatau Decl. ¶ 12; Vickers Decl. ¶ 23.  The harms of these missed opportunities for a growing brand are immeasurable.  Khatau ¶¶ 59-62.

These sorts of harms are inherently difficult to quantify, which is why the presumption of irreparable harm flowing from confusion exists in the first place.  And Rhode has little ability to combat them.  Rhode lacks Bieber's star power and reach, and social media and search engines have already given themselves over to Defendant's rhode-based products.  *Supra* 13-15.  And in today's expansive and viral social media environment, every day that Defendants are allowed to use the infringing mark will diminish the value of RHODE.

The irreparable harm factor weighs strongly in favor of the requested relief.

## III.   THE BALANCE OF EQUITIES TIPS DECIDEDLY IN RHODE'S FAVOR.

Largely for the reasons already discussed, the balance of the equities also tips decidedly

toward Rhode.  As discussed above, to build their brand, Khatau and Vickers took enormous

personal risks, leaving steady jobs and devoting their lives to Rhode.  Vickers ¶ 34.  RHODE is

the company's most significant asset.  But through no fault of its own, Rhode's vision and

success—not to mention the control of its reputation and goodwill—would disappear virtually

overnight.  Unlike someone with the fame, fortune, and following of Bieber, Rhode does not

have the wherewithal to instantly pivot to a new name or venture.  All of Khatau's and Vickers's

work simply gets washed under.

 Defendants, by contrast, just launched their "rhode" line days ago.  The line is but the

latest potentially lucrative venture for an already immensely successful and famous celebrity.

While Bieber plainly places substantial value on use of the mark, given her celebrity and

following, Defendants could have selected any number of other brand names and still can do so.

Indeed, Defendants attempted to register a host of other names, including HRB3, Bieber Beauty,

Moodboard, HB Beauty by Hailey Bieber, HR Beauty, Dew Beauty, Dewy Beauty, HRB, Hailey

Baldwin, and Hailey Bieber.  Khatau Decl. ¶ 58.  At most, the only harm that could conceivably

befall Defendants is the temporary "loss of profits on sales" until a new mark is selected, which

is a "quantifiable" and thus compensable harm—very much unlike the "loss of consumer

goodwill" that Rhode will continue to face.  *Hope Organics*, 2021 WL 5919367, at *13 (quoting

*Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3, 8 (2d Cir. 1996)); *see also Museum of

Mod. Art*, 339 F. Supp. 3d at 383 (concluding that plaintiff's unquantifiable loss of reputation

and goodwill outweighed plaintiff's quantifiable and compensable economic losses, even if

substantial); *Diesel Props S.R.L. v. Greystone Business Credit II LLC*, No. 07-CV-9580, 2008

WL 594773, at *5 (S.D.N.Y. Mar. 5, 2008) (same).

 In any event, any harm that will befall Defendants is of their own making.  They knew of

Rhode's use of the RHODE Marks, but rejected Rhode's entreaties to work out a solution to avoid this confusion. *Supra* 6-7. "[C]onsidering the lack of good faith on the part the defendant[s], including launching the ["rhode"] brand after being notified about the [RHODE] brand, any 'quantifiable' harm that defendant may face was avoidable." *Hope Organics*, 2021 WL 5919367, at *13. In fact, "it is 'axiomatic that an infringer ... cannot complain about the loss of ability to offer its infringing product.'" *Off-White, LLC v. Alins*, No. 19 Civ. 9593, 2021 WL 4710785, at *5 (S.D.N.Y. Oct. 8, 2021) (quoting *WPIX, Inc. v. ivi, Inc.*, 691 F.3d 275, 287 (2d Cir. 2012)).

Through Rhode's requested preliminary injunction, Defendants will be in no way precluded from selling their products or services. Nor would Bieber be prevented from accomplishing her vision for the brand. She will simply need to switch from the infringing name that Defendants have used for mere days to one of many noninfringing marks that could, and should, have been selected in the first place. The equities thus strongly, if not overwhelmingly, favor Rhode. *See, e.g.*, *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 (equities favored the plaintiff where it had sold men's fragrances bearing its mark for years and had multiple registered trademarks and, "[t]he substantial likelihood of consumer confusion and potential loss to [plaintiff] both in terms of sales and reputation threaten to cause … serious harm," and the defendant "ha[d] yet to enter the fragrance market in earnest"); *Les Ballets Trockadero De Monte Carlo, Inc. v. Trevino*, 945 F. Supp. 563, 574 (S.D.N.Y. 1996) (equities favored the plaintiff where the defendant's ballet company would not be prevented from performing under a different name).

## IV.   RHODE'S REQUESTED RELIEF IS IN THE PUBLIC INTEREST.

The requested relief here advances the public's "strong interest in preventing consumer

confusion and protecting federally registered trademarks." *City of New York*, 2021 WL 6063839, at *5 (citing *Juicy Couture, Inc. v. Bella Int'l Ltd.*, 930 F. Supp. 2d 489, 502 (S.D.N.Y. 2013)). Put simply, a preliminary injunction serves the public's "interest in not being deceived—in being assured that the mark it associates with a product is not attached to goods of unknown origin and quality." *New York City Triathlon*, 704 F. Supp. 2d at 344; *see also Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 193 (1985) ("[A] sound public policy requires that trademarks should receive nationally the greatest protection that can be given them."); *U.S. Polo Ass'n*, 800 F. Supp. 2d at 541 ("The consuming public has a protectable interest in being free from confusion, deception and mistake.").

That interest is uniquely strong in this case. Rhode's two women co-founders built a brand from nothing. They had no name recognition to bank on and no portfolio of other ventures to catch them if their business failed. But they believed in their vision and made it real. Their investment and their goodwill are the epitome of what trademark law is designed to protect.

Bieber's product launch threatens to destroy nine years of work in an instant. Rhode's brand stands little chance against Bieber's massive following, innumerable resources, and willful disregard of Rhode's rights. And the public loses out, because while Bieber could still successfully bring her products to the marketplace under another name, Rhode must depend on the one it has built—and will suffer deeply from consumer confusion and possibly the extinction of its brand.

## CONCLUSION

For the foregoing reasons, and upon the facts set forth in the Verified Complaint and accompanying Declarations of Purna Khatau and Phoebe Vickers, Plaintiff Rhode respectfully requests that the Court grant its motion pursuant to Rule 65 of the Federal Rules of Civil

Procedure, for an order preliminarily enjoining Defendants' ongoing trademark and trade name infringement, and unfair competition.


Dated: June 21, 2022
      New York, New York

Respectfully submitted,

/s/ Lisa. T. Simpson
Lisa T. Simpson
Christopher J. Cariello
Rochelle F. Swartz
ORRICK, HERRINGTON
  & SUTCLIFFE LLP
51 West 52nd Street
New York, NY  10019
(212) 506-5000

*Attorneys for Plaintiff*