M7M5rhoC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   RHODE-NYC, LLC,

4                   Plaintiff,

5            v.                              22 CV 5185 (LGS)

6   RHODEDEODATO CORP., *et al.*,

7                   Defendants.              REMOTE PROCEEDING
    ------------------------------x
8                                            New York, N.Y.
                                             July 22, 2022
9                                            1:00 p.m.

10  Before:

11                      HON. LORNA G. SCHOFIELD,

12                                           District Judge

13                          APPEARANCES

14  ORRICK HERRINGTON & SUTCLIFFE LLP
         Attorneys for Plaintiff
15  BY:  ROCHELLE F. SWARTZ
         LISA T. SIMPSON
16
    COOLEY LLP
17       Attorneys for Defendants
    BY:  MICHAEL G. RHODES
18       REBECCA GIVNER-FORBES

19

20

21

22

23

24

25

M7M5rhoC

1          (The Court and all parties appearing telephonically)

2          THE COURT:  We are here in the case of RHODE-NYC, LLC

3     v. Rhodedeodato Corp, et al., 22 Civ 5185.  This conference is

4     being held on the emergency application from plaintiff.  I have

5     looked at your letter, but why don't you speak for yourself and

6     then I will hear from the defendant.

7          Ms. Simpson.

8          MS. SIMPSON:  Yes.  Thank you, your Honor.

9          So yes, shortly after we concluded our hearing

10    yesterday it seems that defendants despite, on our call with

11    the Court, suggesting that they were willing to work with us to

12    provide some protections and keep them in place while we

13    mediated, something to protect our client's mark from being

14    overrun by defendants' mark, shortly thereafter decided to

15    launch a documentary that they've been talking about in their

16    social media for some time and they were going to launch it

17    today at 3:00.  Those announcements appeared mere hours after

18    we finished our hearing.  That documentary is titled "The

19    Making of RHODE."  It has been talked about quite a bit in the

20    social media over the past two months.  There was even an

21    article in Forbes where Ms. Bieber talked about it saying that

22    it is going to be "two and a half years of footage."  She goes

23    on to say I want people to lift the hood up and be part of it

24    and see how it started.  And then she says this is how I'm

25    going to introduce everything to the world.  And that is what's

M7M5rhoC

1    going to happen, your Honor.  This will, again, be another

2    exercise of defendants' rights that has the risk of superseding

3    and overtaking my client's rights.  Everything that will happen

4    after this documentary is aired will confirm that it is

5    defendants that own this mark and not my client, even though my

6    client has superior rights on the mark.

7           We are concerned about this.  Once I found out I

8    reached out right away to the other side, Mr. Hughes, I

9    expressed our concern.  He indicated that he would look into

10   it.  I didn't hear back from him yesterday.  I heard back from

11   him this morning.  The response was terse.  It was basically we

12   will not delay the video.  My ask, your Honor, was not that

13   they not ever show this video, it was simply that they put it

14   off for the weeks that we had discussed to mediate the case.  I

15   know that they can do this because they were originally set to

16   launch this video on June 28th, and in the morning they posted

17   that the video was coming out and then, in the afternoon of

18   June 28, they posted that they were not going to release the

19   video any longer because they were adding more

20   behind-the-scenes footage and that it would come out sometime

21   in July.  So I know that it can be stopped and I am asking the

22   Court, in keeping with the discussion that we had at the

23   hearing yesterday, to delay the release of this video so that

24   we can have discussions without my client suffering the harm

25   that will certainly ensue from this launch on YouTube which

M7M5rhoC

1    will be posted over and over and over again.

2              THE COURT:  OK.

3              Mr. Rhodes.

4              MR. RHODES:  Good morning, your Honor.  First of all,

5    let me express our apologies that Mr. Hughes is not here.  He

6    left this morning on a family vacation and is currently on a

7    plane.  I will be brief and I have a suggestion that I will

8    make to the Court at the end.

9              The video is a marketing video, it is approximately 17

10   minutes long.  I personally have reviewed it twice.  It has

11   absolutely nothing to do with the plaintiff's business.  Its

12   sole focus is how the skin care product line was developed,

13   inspiration, and sort of chronicled the journey that Ms. Hailey

14   Bieber was on in creating her skin care line.  If anything, if

15   anyone were to see it, it would alleviate any potential for

16   confusion because it has absolutely nothing to do with

17   clothing.

18             Secondly, and I know the Court is presumably aware of

19   this, we read with interest this morning the PepsiCo opinion

20   that came out and I would suggest that in light of that opinion

21   and the current state of the record, that the motion for a

22   preliminary injunction should be denied without prejudice at

23   this time.

24             Thirdly, this current application is essentially a

25   temporary restraining order request to preclude it as a prior

M7M5rhoC

1    restraint against us continuing to market and promote our

2    products.  There is no injunction in place.  Now, I will say in

3    respect and out of my personal deference to this Court, I

4    reached the producer of the video overnight.  Mr. Ratner is

5    currently on his honeymoon in Italy.  I reached him overnight,

6    I managed to stop any dissemination of the video until we could

7    have a hearing today.  I think it is absolutely inappropriate

8    that we are talking about enjoining the continuing marketing of

9    our products which are currently in commerce and being sold

10   but, nonetheless, out of respect for the Court I said hold the

11   thing until we have the hearing.  What I would suggest to the

12   Court, if the Court would entertain this, is I will have a link

13   to the video emailed to you immediately and to opposing

14   counsel, and we should conclude this hearing and let you watch

15   it and then you can decide whether or not you think that it

16   should be subject to a temporary restraining order of the kind.

17          I would note, for the record, that at page 23 of the

18   transcript of yesterday's proceedings the Court noted that in

19   connection with any mediation it was not the Court's

20   expectation that we were going to be abandoning our mark.

21          The state of affairs today is that we are in commerce,

22   we have products that are being sold to thousands of customers.

23   We are actively marketing and promoting those products.  There

24   is no injunction in place.  And this is simply a specific form

25   of injunction, a temporary restraining order because it is

M7M5rhoC

1   being done in emergency circumstances.  I literally had to

2   leave a golf round with my colleague this morning to come

3   attend this hearing.  Mr. Hughes is on a plane.  And there is

4   no reason we should be doing this in this properly rushed

5   circumstances but, because I trust this Court, I am happy to

6   send you the video now, conclude the hearing, and let you issue

7   an order as you see appropriate.

8            THE COURT:  OK.  I appreciate that.

9            Here is what I propose to do.  I am going to issue a

10  ruling now on the preliminary injunction but it is subject to

11  my viewing the video.  So, in other words, I won't put anything

12  on the docket until I have viewed the video and if I keep my

13  view then I will put something on the docket.  And if I don't,

14  I won't.  So let me do that and bear with me.  And, I am sorry

15  to interfere with everyone's plans, I know it is a Friday and I

16  know you have been working hard to prepare not only for our

17  conference yesterday but I presumed and hoped that you would be

18  doling that to see if there would be some way to a mediated

19  result.  But, it seems to me that because of this development

20  and, likely, further development, it is probably not realistic

21  to think that waiting a week is actually going to be useful.

22           So, plaintiff seeks an order preliminarily enjoining

23  defendants from continuing to manufacture or sell its

24  infringing RHODE, selling its RHODE products or using RHODE as

25  a name or mark.  "A party seeking a preliminary injunction must

M7M5rhoC

| | |
|---|---|
| 1 | show (1) irreparable harm; (2) either a likelihood of success |
| 2 | on the merits or both serious questions on the merits and a |
| 3 | balance of hardships decidedly favoring the moving party; and |
| 4 | (3) that a preliminary injunction is in the public interest." |
| 5 | N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc., 883 F.3d |
| 6 | 32, 37 (2d Cir. 2018). |
| 7 | My holding is that plaintiff is not entitled to a |
| 8 | preliminary injunction because it has not demonstrated a |
| 9 | likelihood of success on the merits on the federal trademark |
| 10 | claim.  And also, in the alternative and on the issue of the |
| 11 | plaintiff showing both serious questions on the merits and the |
| 12 | balance of hardships decidedly favoring plaintiff, my finding |
| 13 | is that on the record the balance of hardships does not |
| 14 | decidedly tip in favor of plaintiff. |
| 15 | So that is the summary of my ruling.  Let me explain |
| 16 | it.  Bear with me. |
| 17 | So the first element of the federal trademark claim is |
| 18 | that plaintiff has a valid mark that is entitled to protection. |
| 19 | That is undisputed.  However, plaintiff's application falters |
| 20 | on the second element, namely that "the defendants' actions are |
| 21 | likely to cause confusion with that mark."  See *Tiffany & Co.* |
| 22 | *v. Costco Wholesale Corp.*, 971 F.3d 74, 84 (2d Cir. 2020). |
| 23 | A plaintiff "must demonstrate that the defendant's |
| 24 | actions are likely to cause confusion with that mark." |
| 25 | *Tiffany*, 971 F.3d at 84.  Plaintiff's asserts infringement |

M7M5rhoC

based on a reverse confusion theory.  Reverse confusion exists
where a junior user "selects a trademark that is likely to
cause consumers to believe, erroneously, that the goods
marketed by the senior user are produced by the junior user.
*Lang v. Retirement Living Publication Co.*, 949 F.2d 576, 583
(2d Cir. 1991).  "The reverse confusion theory protects the
mark of a senior user from being overwhelmed by a junior user,
typically, where the junior user is larger and better known and
consumers might conclude that the senior user is the
infringer."  *LVL XIII Brands, Inc. v. Louis Vuitton Malletier
S.A.,* 209 F. Supp. 3d 612, 666 (S.D.N.Y. 2016).

In determining whether or not there is a likelihood of
confusion, Courts in the Second Circuit apply the eight factors
from the so-called Polaroid test and they are:

(1) the strength of the trademark; (2) the degree of
similarity between the mark and the defendant's allegedly
imitative use; (3) the proximity of the products and their
competitiveness with each other; (4) the likelihood that the
plaintiff will "bridge the gap" by developing a product for
sale in the defendant's market; (5) evidence of actual consumer
confusion; (6) evidence that the defendant adopted the
imitative term in bad faith; (7) the respect of quality of the
product; and (8) the sophistication of the relevant population
of consumers.  And that is from the *Polaroid Electronics* case,
287 F.2d 492, 495 (2d Cir. 1961).

M7M5rhoC

1    Six of these factors directly relate to the likelihood

2  of confusion.  The other two -- good faith and the quality of

3  the defendant's products -- are more pertinent to other issues

4  so let me start with the first factor which is the strength of

5  the mark.

6    Both parties' mark consists of the same single word

7  which is "RHODE" and this factor -- strength of the mark --

8  weighs in defendants' favor.

9    "The first pertinence of the strength of a mark has to

10  do with likelihood of public confusion.  The more unusual and

11  distinctive a particular mark, the more likely the consumer

12  will assume, upon seeing it essentially replicated, that the

13  newly observed user is the same as or affiliated with the

14  originally observed user."  *Guthrie Healthcare Sys. v.*

15  *ContextMedia, Inc.*, 826 F.3d 27, 41 (2d Cir. 2016).  A mark's

16  "strength" is "crucial to the likelihood of confusion analysis"

17  in a reverse confusion case because the plaintiff's well-known

18  association with the claimed mark "makes it much more likely

19  that consumers will assume wrongly that the plaintiff is

20  somehow associated with the defendant's product or has

21  authorized the use of its mark."  *Lois Sportswear U.S.A., Inc.*

22  *v. Levi Strauss & Co.*, 799 F.2d 867, 873 (2d Cir. 1986).

23    The strength of a mark is based on either or both of

24  two components: "(1) the degree to which the mark is inherently

25  distinctive; and (2) the degree to which it has achieved public

M7M5rhoC

1    recognition in the marketplace, sometimes calls acquired

2    strength."  That's from *RiseandShine Corporation v. Pepsi*

3    *Company*, that decision was issued just today by the Second

4    Circuit, that is from page 9 and my page references from here

5    are to the full opinion.

6          Inherently strong marks receive greater protection.

7    Inherent distinctiveness is assessed using four categories of

8    marks that create increasing distinctiveness and, therefore,

9    protectability:  (1) generic; (2) descriptive; (3) suggestive;

10   and (4) arbitrary or fanciful.  See Id.  As relevant here, a

11   descriptive mark is "one that tells something about a product,

12   its quality, ingredients, or characteristics."

13   *Gruner + Jahr USA Pub., a Div. of Gruner + Jahr Printing & Pub.*

14   *Co. v. Meredith Corp.*, 991 F.2d 1072, 1076 (2d Cir. 1993).

15   "Descriptive marks are presumptively unprotectable but can

16   acquire a degree of protection if they have acquired secondary

17   meaning, i.e. an acquired public recognition of the mark

18   identifying the source.  *RiseandShine* at 11 and 12.  A

19   suggestive mark suggests the product, though it may take

20   imagination to grasp its nature.  Id.  An arbitrary mark has an

21   actual dictionary meaning, but that meaning does not describe

22   the product, and a fanciful mark is a made-up name.  See Id.

23         So plaintiff argues that its use of "RHODE" as a mark

24   is arbitrary and fanciful because the mark neither describes

25   nor suggests anything about the product, warranting the highest

M7M5rhoC

1   degree of protection, but under Second Circuit law, plaintiff's

2   mark is in the category of descriptive because "RHODE" is a

3   personal name.  As plaintiff's co-founders acknowledged, their

4   clothing brand adopted the name of a Greek mythological sea

5   nymph "Rhode" known as the Goddess of Rhodes, R-H-O-D-E-S.  I

6   also note that the more common name Rhoda, R-H-O-D-A, is

7   another spelling of the same first name and Rhode is, in fact,

8   the middle name of the defendant Hailey Rhode Bieber.  Both

9   surnames and first names are generally regarded as descriptive

10  terms which require a secondary meaning in order to be

11  protected, *815 Tonawanda Street Corp v. Fay's Drug Company*, 842

12  F.2d 643, 648 (2d Cir. 1988), and that the plaintiff's mark

13  does not refer to a real individual does not warrant a

14  departure from this general rule.  See *Tonawanda*, 842 F.2d

15  847-48 and *Hello I Am Elliot, Inc. v. Sine*, No. 19 Civ. 6905,

16  2020 WL 3619505, at *8 (S.D.N.Y. July 2, 2020).

17          Because the mark is descriptive, plaintiff must

18  establish that it has a secondary meaning for it to be

19  protectable.  Put differently, because the mark is not

20  arbitrary or fanciful, it is important to evaluate whether the

21  mark has acquired distinctiveness in the market and that is

22  determined by analyzing six factors:  "advertising

23  expenditures, consumer studies linking the market to a source,

24  unsolicited media coverage of the product, failed success,

25  attempts to plagiarize the mark, and the length and exclusivity

M7M5rhoC

1   of the mark's use." *Car-Freshener Corp v. American Covers,*

2   *LLC*, 980 F.3d 314, 329 (2d Cir. 2020).  Like the entire

3   Polaroid analysis, each factor does not have to be proved and

4   no single factor is determinative.

5          We had some discussion yesterday about the

6   constructive use date.  The plaintiff is required to show that

7   the mark established secondary meaning before the defendants'

8   constructive use date.  It is unclear from the record when that

9   actually was.  At the earliest it is February 6, 2020, the date

10  defendants' filed their trademark application for RHODE, and at

11  the latest it is mid-June 2022 when defendants' products

12  entered the market.  See *PaperCutter, Inc. v. Fay's Drug Co.,*

13  *Inc.,* 900 F.2d 558, 565, (2d Cir. 1990); *Saratoga Vichy Spring*

14  *Co., Inc. v. Lehman*, 625 F.2d 1037, 1043, (2d Cir. 1980)).

15         In any event, I'm not going to resolve what the

16  constructive use date is here.  I think it is not entirely

17  clear from the record and regardless of the date, it doesn't

18  change my conclusion.

19         Based on the record before me, plaintiff has not shown

20  that the mark RHODE has acquired a secondary meaning and

21  acquired recognition in the market, that the mark identifies

22  plaintiff as the source.

23         So, turning to the first factor, advertising,

24  plaintiff has presented evidence that it spent more than

25  $1 million on brand advertising in 2021 and is on track to

M7M5rhoC

spend about 30 percent more in 2022.  The issue I have with
that is that I can't tell whether these amounts are significant
in the relevant market and I don't have, from the record, a
basis for comparison.

Next, consumer study.  Plaintiff did not present
consumer studies supporting a finding of secondary meaning.

Third, unsolicited media coverage.  Plaintiff
submitted evidence of unsolicited media coverage.  There are
several articles but the articles themselves, I don't find,
support a finding of secondary meaning.

Sales success.  Plaintiff has achieved what it
describes as considerable sales success measured in terms of
revenues, growing the brand from $100,000 in sales beginning in
2014 to $9 million in 2021, and projected sales of
approximately $14.5 million for 2022 and $20 million for 2023.
So.  So, based on those numbers, taken alone, it can be
inferred that plaintiff has achieved some sales success but the
issue I'm having is, again, I'm lacking context.  The question
here is whether the mark has established its own secondary
meaning in the market as is evidenced by sales success, and so
the relevant measure to me seems to be, as compared to the
market as a whole to the underlying product.  In other words,
does the product garner a big enough market share to suggest
that the mark has taken on its own secondary meaning -- and by
market share I just mean in terms of revenue.  I can't tell and

M7M5rhoC

don't know if these are infinitesimally small numbers or if they are quite large and impressive numbers.  I don't have that context in the record and so I don't have a basis to determine that.

The next factor, attempts to plagiarize the mark. Plaintiff has not presented evidence of any such attempt.

Finally, length and exclusivity of the mark's use. "The longer and more exclusive the trade use, the more likely it is that a mark has acquired secondary meaning, and Courts often point to five years of exclusive use of a mark as evidence of secondary meaning."  *RVC Floor Decor, Ltd. v. Floor and Decor Outlets of Am., Inc.*, 527 F. Supp. 3d 305, 318

Plaintiff has used its mark since 2014 but the evidence is mixed as to when or how long that use has been exclusive.  Plaintiff asserts in its declaration that it is the only company using RHODE standing alone as a clothing brand. Defendants provide evidence that several entities use RHODE or RHODES for similar goods, and when I say "RHODES" it is R-H-O-D-E-S, including 10 for apparel and two more for footwear, and I am referring to and incorporating by reference the defendants' list of entities in their papers.

So, in sum, looking at these factors collectively, they do not -- well, first of all, let me say individually I don't think that any of them individually tips conclusively in favor of plaintiffs and taking them together does not change

M7M5rhoC

1    the balance.  So, based on the evidence at this time, my

2    finding is that the mark is weak and the strength of the mark

3    factor in the Polaroid does not favor a preliminary injunction,

4    and specifically that plaintiff has not shown the likelihood of

5    ultimately proving that its descriptive mark had acquired a

6    secondary meaning at the relevant time.

7            So let me turn to the other Polaroid factors more

8    quickly.  The second is the similarity of the marks.  It weighs

9    in favor of plaintiff.  This inquiry looks at "how the marks

10   are presented in the marketplace."  *Sports Authority, Inc.*, 89

11   F.3d at 962.  Here the two marks consist solely of the single

12   word "RHODE" although, as defendant argues, the brand aesthetic

13   of each party is the virtual opposite from the other and the

14   typefaces and colors used by each are distinct.  One notable

15   difference, in particular, is that between the two marks is

16   that the plaintiff tends to use all capitals whereas defendants

17   tend to use all lower case.  In any event, I find that the

18   similarity of the marks, that factor tips in plaintiff's favor.

19           The third factor is the proximity of the products and

20   their competitiveness with each other.  "The proximity factor

21   can apply to both the subject matter of the commerce in which

22   the two parties engage and the geographic areas in which they

23   operate."  *Guthrie*, 826 F.3d, 39.  Market proximity looks at

24   "whether and to what extent the two products compete with each

25   other," considering "the nature of the products themselves and

M7M5rhoC

the structure of the relevant market." *Cadbury Beverages,*

*Inc., v. Cott Corporation*, 73 F.3d 474, 480 (2d Cir. 1996).

This factor favors the defendants.  While in a general sense,

cosmetics and women's clothing may be related products, they do

not serve common functions, they do not compete, they don't

share physical attributes, they are not inherently comparable.

          The fourth factor is likelihood that plaintiff will

bridge the gap by developing a product for sale in defendant's

market.  Plaintiff points to evidence that defendants intend to

bridge the gap into clothing citing statement of Ms. Bieber.

In her declaration she disclaimed any such intention and her

counsel stated on the record and repeatedly represented to the

Court that the defendants have no such intention.  Ms. Bieber's

declaration states "In the future, I may use HAILEY RHODE for a

clothing label.  I will not, however, use RHODE alone as a

trademark for a clothing line in the United States."

          At this stage, prior to any discovery, the record is

too thin to support a finding that defendants intend to bridge

the gap under the "RHODE" mark and this factor, therefore,

favors neither party.

          The fifth Polaroid factor is actual confusion.  "It is

black letter law that actual confusion need not be shown to

prevail under the Lanham Act since actual confusion is very

difficult to prove and the Act requires only a likelihood of

confusion as to source." *Guthrie*, 826 F.3d at 45, *accord Reply*

M7M5rhoC

1    *All Corp. v. Gimlet Media, LLC*, 843 F. App'x 392, 397 (2d Cir.

2    2021).  Nevertheless, "instances of actual confusion resulting

3    from a junior user's use of a mark similar to a senior user's

4    can be powerful evidence supporting a likelihood of confusion.

5    *Guthrie*, 826 F.3d at 44.  I would also note that evidence of

6    actual confusion may also support a finding of secondary

7    meaning.  See McCarthy on Trademarks and Unfair Competition,

8    Section 15:11 (5th ed).

9            Plaintiff presents anecdotal evidence purporting to

10   show actual confusion.  I find that this factor is neutral

11   because the specific instances presented are problematic.  Some

12   do not reflect confusion about the source of plaintiff's

13   product but, instead, reflect confusion about plaintiff's

14   correct Instagram handle or perhaps contact information.  Some

15   do not reflect confusion but, instead, are simply inquiries or

16   observations, or some predate the defendant's launch.  And

17   some, which are social media posts, I find, are inherently

18   unreliable.

19           Let me just make a comment about that.

20   Unauthenticated social media messages are insufficient to

21   support a finding of confusion.  It is widely reported and well

22   known that social media messages, in general, are often

23   manipulated, sometimes generated by companies paid to generate

24   traffic to an account, sometimes sent by fictitious senders,

25   including bots, and sometimes containing insincere messages

M7M5rhoC

created to sew division or some other purpose unrelated to the

message.

So, for these reasons, I am finding that the actual

confusion factor is neutral.

Bad faith is the sixth Polaroid factor and it is

whether the defendant acted in bad faith in adopting the

imitative term.  As I mentioned, this factor, along with

quality of the product, is not highly relevant to the

likelihood of confusion analysis.  See *Virgin Enterprises Ltd.*

335 F.3d at 151.  Rather "a finding that a party acted in bad

faith can affect the Court's choice of remedy or can tip the

balance when questions are close." Id.  Here, plaintiff asserts

that defendants adopted the RHODE mark in bad faith after

plaintiff denied defendants' request to purchase its marks.  At

this stage, before discovery, the record is too thin to support

any finding of bad faith and therefore I find that this factor

also favors neither party.

The seventh factor is quality of the product.  This

factor primarily affects the issue of harm to the senior user's

reputation and is less pertinent to the likelihood of

confusion.  *Virgin Enterprises*, 335 F.3d at 151.  I am

considering this factor as neutral also.

Eighth, the buyer's sophistication.  Plaintiff argues

that online shoppers are less discerning because of the medium.

Defendants respond that consumers of expensive clothing brands

M7M5rhoC

1    are sophisticated and careful.  I find this factor to be

2    inconclusive on the current record.

3            So overall, where does that leave us?  As the

4    RiseandShine Court pointed out it is a weighing and balancing

5    analysis.  Examining all of the Polaroid factors as a whole, I

6    find that plaintiff has not sustained its burden of showing

7    sufficient likelihood of success on the merits to warrant a

8    preliminary injunction.  Only the degree of similarity between

9    the parties' marks weighs in favor of plaintiff and that factor

10   is undercut by the fact that the mark is weak without much

11   evidence that plaintiff's mark has acquired distinctiveness

12   through secondary meaning.  The lack of competitive proximity

13   between the parties' products also undercuts a finding of

14   likelihood of success on the issue of confusion.  To be clear,

15   the fact that defendants are selling skin care products and

16   plaintiffs are selling women's clothing is an important fact in

17   my analysis.  The remaining factors are neutral.  Plaintiff may

18   well be able to show confusion at some later point but now and

19   on this record I find that it has not shown a likelihood of

20   success on that issue.

21           I want to address balance of hardships because the

22   standard of what needs to be shown at an injunction is in the

23   alternative, and in lieu of showing likelihood of success on

24   the merits, a plaintiff may prevail by a showing both serious

25   questions on the merits and a balance of hardships decidedly

M7M5rhoC

favoring plaintiff in order to obtain an injunction.  See *N.*
*Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32,
37 (2d Cir. 2018).  I'm not making a finding on whether the
plaintiff has shown serious questions on the merits because I
find that the balance of hardships aspect of the test has not
been shown.

     "Courts must balance the competing claims of injury
and must consider the effect of each party of the granting or
withholding of the requested relief."  *Winter v. Nat. Res. Def.*
*Council, Inc.,* 555 U.S. 7, 24 (2008).

     Here, plaintiff contends that it will continue to be
harmed without injunctive relief as it will lose control of the
RHODE identity and lose sales to confused consumers.
Defendants contend that they would incur substantial
re-branding cost, lost sales, and harm to its goodwill if this
Court issues the requested preliminary injunction enjoining
defendants from continuing to manufacture or sell its
infringing -- allegedly -- RHODE products or use RHODE as a
name or mark.  These hardships I find do not "decidedly" tilt
in plaintiff's favor, particularly where defendants have
disclaimed any intent to enter into the clothing market.  See
*Benihana, Inc. v. Benihana of Tokyo, LLC,* 784 F.3d 887, 897 (2d
Cir. 2015).

     Accordingly, for this alternative reason, the
preliminary injunction is denied.  The denial is without

M7M5rhoC

1   prejudice.  As I have said on the record before me, I have

2   found what I found, I won't repeat it all, but it is without

3   prejudice.  It is also subject to my review of the video, as I

4   have earlier said.

5            So we have a court reporter, there should be a

6   transcript, and I will review the video.  As soon as I have, I

7   will issue an order.  I will issue an order one way or the

8   other.

9            So, we are adjourned.  Thank you.

10                              o0o

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25